[No. 61823-7-I. Division One. July 6, 2009.]

PARAMJIT SINGH ET AL., *Respondents*, v. EDWARDS LIFESCIENCES CORPORATION, *Appellant*.

138

*Kelly P. Corr, Steven W. Fogg*, and *William H. Walsh* (of *Corr Cronin Michelson Baumgardner & Preece, LLP*) (*Paul V. Esposito* and *Edward M. Kay* of *Clausen Miller*, of counsel), for appellant.

*Paul N. Luvera, Jr., Joel D. Cunningham, Robert N. Gellatly, Jr., Deborah Martin*, and *Andrew Hoyal* (of *Luvera Barnett Brindley Beninger*); *Howard M. Goodfriend* (of *Edwards Sieh Smith & Goodfriend, PS*); and *Kathy A. Cochran* and *Shilpa Bhatia* (of *Wilson Smith Cochran Dickerson*), for respondents.

¶1 GROSSE, J. — Washington State follows the *Restatement (Second) of Conflict of Laws'* most significant relationship test in determining which state's law applies to a given issue. Here, the plaintiff underwent a heart transplant after his heart was burned as a result of a defective heart monitor used during surgery in a Washington hospital. The heart monitor was developed by a California-based company that knew of the defect but failed to correct the defect or warn the parties of the potential problem.

¶2 Even though Washington has a strong policy against punitive damages, it has no interest in protecting companies that commit fraud. Where, as here, an entity headquartered in California committed the conduct in California that resulted in the plaintiff's damages, California had the greater interest in deterring such fraudulent activities. We affirm.

## FACTS

¶3 Paramjit Singh went into Providence Everett Medical Center in October 2004 for a relatively routine heart bypass surgery. During surgery, an Edwards Lifesciences' monitor

malfunctioned, which turned off the fail-safe devices, causing the Swan-Ganz catheter inserted into Singh's heart to heat up, destroying his heart.

¶4 After the surgery, doctors were unable to restart Singh's burned heart and he was kept alive with a mechanical heart device for 11 weeks. He then received a heart transplant at the University of Washington Medical Center. The drugs taken to prevent rejection of his transplanted heart caused Singh to develop blood cancer. Currently that cancer is in remission but he is expected to continue to have severe medical problems associated with both the cancer and his heart transplant.

¶5 Singh filed a products liability claim against Edwards. Providence filed cross claims against the manufacturer for fraud, violation of the Consumer Protection Act (CPA),[1] and breach of contract. Both parties sought punitive damages under California law. Edwards admitted its liability for compensatory damages to the plaintiff but contended that Providence shared in that liability.

¶6 The evidence presented at trial revealed that Edwards knew there was a flaw in the heart monitor device as early as 1998. The monitor contained rogue software (Layout 6) that could defeat the fail-safe triggers meant to ensure the catheter would not overheat. The Layout 6 software had originally been installed in an earlier model of the heart monitor. The software was subsequently abandoned but never removed. A July 17, 1998 memorandum from Edwards' principal software designer, Glenn Cox, noted the discovery of the bug in the software. At that time, the monitor's crash was associated with a faulty continuous cardiac output cable attached to a monitor with a bug in the software. The solution proposed and eventually undertaken in 2006 was to remove the Layout 6 software. A release of heart monitors in 2000 did not have the software removed.

¶7 In October 2002, a catheter caught fire during an operation in Japan. Luckily, the catheter had just been

---

[1] Ch. 19.86 RCW.

removed when the incident occurred. The research in California once again associated the heating of the element with the rogue software, Layout 6. Edwards again decided in California not to recall or warn any of the users but instead to remove the software when a monitor came back in for repair.

¶8 At the time of Singh's surgery, Providence had 11 monitors, 3 of which had been repaired and no longer contained the Layout 6 software bug. Unfortunately, Singh's surgery involved the use of a monitor that had not needed repair. At the end of the surgery, surgeons discovered the damage only after trying to take Singh off bypass.

¶9 In June 2006, Edwards recalled the monitor after an extensive investigation by the United States Food and Drug Administration. Edwards admitted the monitor malfunctioned during Singh's operation. In August 2007, Edwards admitted that Layout 6 was a proximate cause of injury to Singh. On January 18, 2008, Edwards admitted its liability for compensatory damages to Singh but contended that Providence shared in that liability by its use of a defective cable with the monitor.

¶10 The jury returned a verdict in favor of the Singh family for $31,750,000 and awarded punitive damages under California law. The jury allocated 99.9 percent of the fault to Edwards and 0.1 percent of the fault to Providence. The jury awarded Providence compensatory damages in the amount of $210,000. The jury also found that Edwards' conduct was malicious and, under California law,[2] awarded punitive damages in the amount of $8,350,000 to Singh and $100,000 to Providence. In addition to the compensatory damages awarded to Singh and his family, the jury found Edwards had committed fraud, violated the CPA, and breached its contracts with Providence.

¶11 Edwards appeals, arguing that punitive damages should not have been awarded, and that the evidence supporting punitive damages was so entwined with the

---

[2] CAL. CIV. CODE § 3294.

evidence supporting the compensatory damages that the amount awarded for the compensatory damages was higher than it otherwise would have been. Edwards also argues that the jury instruction on insurance should not have been given.

## ANALYSIS

Choice of Law

 ¶12 In resolving conflict of law tort questions, Washington has abandoned the lex loci delicti rule and follows the *Restatement (Second) of Conflict of Laws*' most significant relationship test.[3] Where a conflict exists, Washington courts decide which law applies by determining which jurisdiction has the most significant relationship to a given issue.[4] The court "must evaluate the contacts both quantitatively and qualitatively, based upon the location of the most significant contacts as they relate to the particular issue at hand."[5] The contacts to be evaluated for their relative importance to the issue were set forth in *Johnson v. Spider Staging Corp.*:[6]

"(a) the place where the injury occurred,

"(b) the place where the conduct causing the injury occurred,

"(c) the domicile, residence, nationality, place of incorporation and place of business of the parties, and

"(d) the place where the relationship, if any, between the parties is centered."

 ¶13 In *Johnson*, scaffolding designed and manufactured in Washington collapsed in Kansas, causing the death of a Kansas resident. The conflict of law issue was whether

---

[3] *Johnson v. Spider Staging Corp.*, 87 Wn.2d 577, 580, 555 P.2d 997 (1976).

[4] *Zenaida-Garcia v. Recovery Sys. Tech., Inc.*, 128 Wn. App. 256, 115 P.3d 1017 (2005), *review denied*, 156 Wn.2d 1026, 132 P.3d 1094 (2006).

[5] *Martin v. Goodyear Tire & Rubber Co.*, 114 Wn. App. 823, 830, 61 P.3d 1196 (2003) (citing *Johnson*, 87 Wn.2d at 581).

[6] 87 Wn.2d 577, 581, 555 P.2d 997 (1976) (quoting Restatement (Second) of Conflict of Laws § 145 (1971)).

Washington's law, which allowed unlimited recovery in wrongful death actions, or Kansas' law, which imposed a $50,000 ceiling, should apply. In holding that Washington law applied, the *Johnson* court enunciated a two-step analysis to be employed to determine the appropriate choice of law. The court must first evaluate the contacts with each potentially interested state and then, if balanced, evaluate the public policies and governmental interests of the concerned states. The court in *Johnson* concluded without further comment that the contacts were "evenly balanced."[7] The *Johnson* court also considered the parties' justified expectations.[8] The Washington corporation sold its products in all 50 states, only a few of which had wrongful death limitations. Thus, the manufacturer "could not have justifiably relied on the Kansas limitation."[9] Conflict of law analysis in Washington is thus a hybrid of the *Restatement (Second) of Conflict of Laws* and a governmental interest analysis.

¶14 Washington courts have held that these same choice of law principles apply to the issue of punitive damages. In *Kammerer v. Western Gear Corp.*,[10] the court permitted a Washington jury to award punitive damages against a Washington corporation, applying California law to a claim based on fraudulent representation. In so holding, the court noted:

> "California has an interest in deterring fraudulent activities by corporations having a substantial business presence within its borders. Washington has no interest in protecting persons who commit fraud. Western Gear asserts that differences in Washington and California law governing fraud suggest that Washington has a policy of greater caution in allowing judgments for fraud. Because we do not find any difference, material to this

---

[7] *Johnson*, 87 Wn.2d at 582.

[8] *See Potlatch No. 1 Fed. Credit Union v. Kennedy*, 76 Wn.2d 806, 812-13, 459 P.2d 32 (1969).

[9] *Johnson*, 87 Wn.2d at 583 n.3.

[10] 96 Wn.2d 416, 635 P.2d 708 (1981).

case, in the laws of the two states, we do not find any interest served by application of Washington law. Because Washington has no interests superior to or inconsistent with the interests of California in this controversy, application of the Restatement rule dictates that California law govern the Kammerers' claim for fraud."[11]

The significant factor in *Kammerer* was the jurisdiction in which the bad behavior—fraudulent misrepresentation—occurred.

¶15 In *Barr v. Interbay Citizens Bank of Tampa, Florida*,[12] a companion case issued on the same day as *Kammerer*, the Supreme Court rejected the application of Florida's punitive damages because the conduct that warranted the punitive damages occurred in Nevada and Washington. The Florida lender hired agents in Nevada to travel to Washington to repossess George Barr's automobile. Barr sued for conversion, seeking punitive damages under Florida law. The Supreme Court recognized Florida's legitimate interest in imposing punitive damages but rejected Florida as the state with the most significant relationship:

> The interest in Florida in providing an example for deterrence would not be furthered when the actual conduct and the acts which might warrant punitive damages were restricted to Nevada and Washington.[13]

In *Barr*, the crux of the complaint was not the decision to repossess the car (purchased in Florida) but rather the method used to repossess that car.

¶16 A recent decision of this court, *Zenaida-Garcia v. Recovery Systems Technology, Inc.*,[14] applied Washington product liability law. There, a fatal industrial accident in

---

[11] *Kammerer*, 96 Wn.2d at 422 (quoting *Kammerer v. W. Gear Corp.*, 27 Wn. App. 512, 520-21, 618 P.2d 1330 (1980)).

[12] 96 Wn.2d 692, 635 P.2d 441, 649 P.2d 827 (1981).

[13] *Barr*, 96 Wn.2d at 699.

[14] 128 Wn. App. 256, 115 P.3d 1017 (2005), *review denied*, 156 Wn.2d 1026 (2006).

Oregon was caused by a defective machine manufactured in Washington. In determining which statute of repose would apply—Oregon's 8-year or Washington's 12-year—the court reiterated *Johnson*'s mantra that although there is a presumption that the law of the place of injury applies in personal injury cases, that presumption is overcome if another state has a greater interest in the determination of that particular issue. The *Zenaida-Garcia* court applied Washington's law. In its holding, the court noted that the defendant was a Washington corporation that designed the equipment. The cause of the action was the negligent and unsafe design, thus centering the relationship in Washington. Holding that the contacts were evenly balanced, the court weighed the policy interests of the two states in having its statute of repose govern and apply.[15] Washington's statute of repose expressed a policy of deterrence of tortious conduct, which encouraged manufacturers to make safe products for consumers. Oregon had no interest in protecting a Washington corporation and indeed no such rule protects Oregon citizens. "The extent of the interest of each potentially interested state should be determined on the basis, among other things, of the purpose sought to be achieved by their relevant local law rules and the particular issue involved."[16]

¶17 Here, Edwards argues that the methodology employed by the trial court to determine that California law applied was incorrect because the sheer number of contacts with Washington warranted application of its law. But if the particular conduct is viewed as it is in *Kammerer, Barr,* and *Zenaida-Garcia,* the conduct which resulted in the injury occurred in California. Edwards' corporate headquarters is located in California and the defect in the software was discovered in California as early as 1998. And by 2002, the foreseeable heating of the catheter in a surgical setting was known by Edwards and again the decision was made in

---

[15] *Zenaida-Garcia,* 128 Wn. App. at 263.

[16] *Southwell v. Widing Transp., Inc.,* 101 Wn.2d 200, 204, 676 P.2d 477 (1984) (citing *Johnson,* 87 Wn.2d at 582).

California not to recall or warn users. Had the warning been given, Providence could have used one of the three "repaired" monitors for its bypass surgeries and Singh would not have been injured. Further, the operator's manual directing the surgeon to use the bolus or cool method was written in California.

¶18 Edwards' reliance on *Martin v. Humbert Construction, Inc.*[17] and *Rice v. Dow Chemical Co.*[18] for the proposition that the injury occurred in Washington is unpersuasive. Although there is presumption that the law of the state where the injury occurred applies in personal injury cases, this presumption may be overcome if another state has a greater interest in determination of a particular issue.[19] In *Martin*, unlike here, the defendant's contacts with Oregon were nonexistent. In *Rice*, the plaintiff developed leukemia after exposure to herbicides manufactured by Dow Chemical Company.[20] The court held that Oregon law applied, not Washington law, because the only Washington contact was the plaintiff's residency. The *Rice* court reiterated that "[t]he old rule that the law of the place of the wrong governs the action has been rejected for the 'most significant relationship' rule."[21]

¶19 In analyzing which state has the greater governmental policy interest, Edwards contends that it is Washington, with its policy that rejects the award of punitive damages unless provided for by statute. Edwards argues that Washington's interest is in permitting full compensation for injured parties and none in permitting a *windfall* for plaintiffs. But, as already noted, Washington courts have allowed punitive damages in other cases. In *Kammerer*, in particular, the court explicitly stated that Washington has no interest in protecting companies who commit

[17] 114 Wn. App. 823, 829-30, 61 P.3d 1196 (2003).

[18] 124 Wn.2d 205, 215, 875 P.2d 1213 (1994).

[19] *Martin*, 114 Wn. App. at 830; RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 146.

[20] *Rice*, 124 Wn.2d at 205.

[21] *Rice*, 124 Wn.2d at 215 (citing *Johnson*, 87 Wn.2d at 580).

fraud. The conduct that serves as the basis of the punitive damage award here occurred in California and that state has an interest in deterring its corporations from engaging in such fraudulent conduct.

## Commingling of Evidence

¶20 The jury's verdict was well within the evidence presented. Because of Edwards conduct, Singh's heart was irreparably burned. He was in a coma for over 11 weeks. He suffered anoxic brain damage and underwent a heart transplant. Singh developed blood cancer as a result of the antirejection drugs and underwent chemotherapy. He is slated for kidney dialysis and needs a kidney transplant in the near future. He has a significant risk of future cancers, including a recurrence of the blood cancer, as well as a significant risk of needing another heart transplant, but he will probably not be physically eligible for that surgery.

¶21 Evidence of Singh's economic damages for medical bills was estimated at $2,697,230, which does not include an anticipated second heart transplant. In listing the noneconomic damages, Singh argued for the following:

- Singh - $24,397,230
- Wife - $9,500,000
- Children - $1,000,000 (each)

¶22 Dr. Lowell Basset, an economist, calculated the present value and future care costs of Singh. Edwards did not call any witnesses to counter the damages and injuries suffered by the Singh family. Evidence was introduced that Edwards had gross revenues over a billion dollars and a net worth over $835 million. The court instructed the jury that Edwards' revenues were not to be considered in awarding damages.

¶23 When Dr. Basset completed his testimony regarding the compensatory damages, and before he was questioned regarding punitive damages and any monetary evaluation of those damages, the jury was given a limiting instruction

advising them the ensuing evidence was to be considered only if the jury first determined that there was a basis for an award of punitive damages; such evidence was not to be considered for any other purpose or with regard to any other issues. The awarded punitive damages of $8,350,000 were one percent of Edwards' net worth—a quarter of the compensatory damages. This is evidence that the jury's award was not a runaway verdict.

¶24 Both Providence and Singh offered to try Singh's and Providence's compensatory claims in one trial phase, with a second phase reserved to deal with the issue of "malice," an element required under California law. Edwards declined.

¶25 Edwards admitted that it was at fault, but only partially. Edwards argued that Providence negligently failed to discard a defective cable. The evidence presented at trial indicated that the cable used in the surgery had one prong that was less than a millimeter shorter than the others. These are factual issues for the jury, which decided that Edwards was 99.9 percent liable. The fact that Providence's liability was only 0.1 percent does not negate the judgment.

¶26 Much of the evidence that Edwards argues should have been excluded was relevant to both the compensatory claims as well as Edwards' contention that fault should be allocated to Providence. Edwards' motion to trifurcate the trial was denied earlier. Indeed, after presiding over the trial, the court remarked that its initial decision to not trifurcate was validated after hearing all of the evidence presented.

¶27 In denying Edwards' motion for a new trial, the trial court noted that the jury verdict was less than the plaintiffs' sought and more than Edwards had proposed. The trial court found that the jury verdict showed restraint in its award of punitive damages.

¶28 The only evidence that could possibly be considered prejudicial was the introduction of Edwards' wealth.

But any objection to its admission was waived when Edwards elected to not separate punitive from compensatory damages. Further, the trial court issued limiting instructions both pretrial and posttrial, admonishing the jury that it should not consider Edwards' wealth and post-accident conduct in determining the Singh's compensatory claims.

¶29 Edwards does not cite to the particular information that is so prejudicial or the information which should not have been admitted into evidence. As noted in its denial of Edwards' motion, the court stated:

> Other than the wealth issue, it's very hard, given that we're trying allocation of liability and Providence's claims together to see what it is that came in that wouldn't otherwise have come in anyway. The jury was clearly instructed as to what they could consider – what issues they considered for the evidence on at trial, and both at the beginning and at the end, and they were getting limiting instructions. And so the Court does not find prejudice related to its failure to trifurcate the trial, and certainly does not feel there's a need for a new trial because of that.

¶30 The trial court had various tools to ensure that any prejudice to Edwards in allowing a punitive damage claim to go forward did not affect the liability portion of the trial. Here, the trial court used those tools with its limiting instructions and verdict forms.

## Jury Instruction

¶31 The court reviews jury instructions de novo.[22] The Washington Supreme Court summarized the standard of review for jury instructions in *Keller v. City of Spokane*:[23]

> "Jury instructions are sufficient when they allow counsel to argue their theory of the case, are not misleading, and when

---

[22] *Thompson v. King Feed & Nutrition Serv., Inc.*, 153 Wn.2d 447, 453, 105 P.3d 378 (2005).

[23] 146 Wn.2d 237, 249-50, 44 P.3d 845 (2002) (citation omitted) (quoting *Bodin v. City of Stanwood*, 130 Wn.2d 726, 732, 927 P.2d 240 (1996)).

read as a whole properly inform the trier of fact of the applicable law." Even if an instruction is misleading, it will not be reversed unless prejudice is shown.

But where a jury instruction correctly states the law, as here, "the court's decision to give the instruction will not be disturbed absent an abuse of discretion."[24]

¶32 Instruction 11 provides:

You must not discuss or speculate about whether any party has insurance or other coverage available. Whether a party does or does not have insurance has no bearing on any issue that you must decide. You are not to make, decline to make, increase, or decrease any award because you believe that a party does or does not have medical insurance, workers' compensation, liability insurance, or some other form of coverage.

The instruction is based on *Washington Pattern Jury Instructions: Civil* 2.13.[25] The Washington Supreme Court's Committee on Pattern Jury Instructions recommended that this instruction be given when the court was concerned that jurors might speculate about insurance or other sources of funding.[26]

¶33 Here, there was evidence that the jurors were speculating about insurance. The issue was raised in voir dire by a potential juror who explained that insurance had paid for his employee's heart transplant. Further, a juror posed a question during trial about whether or not Singh had any insurance. Although the court properly refused to ask the juror's question, the exchange does indicate that the jury or at least one juror was considering insurance.

¶34 Edwards argues that instruction 11 was unwarranted. Edwards cites to a 1934 case, *Graves v. Mickel*,[27] to

---

[24] *Micro Enhancement Int'l, Inc. v. Coopers & Lybrand, LLP*, 110 Wn. App. 412, 430, 40 P.3d 1206 (2002).

[25] 6 WASHINGTON PRACTICE: WASHINGTON PATTERN JURY INSTRUCTIONS: CIVIL 2.13, at 49 (5th ed. 2005) (WPI).

[26] WPI 2.13.

[27] 176 Wash. 329, 29 P.2d 405 (1934).

support its position that the giving of such an instruction may be prejudicial in and of itself. But *Graves* is distinguishable. There, the court found there was nothing in the record which would give sufficient reason to proffer such an instruction.[28] This is not the case here. Moreover, insurance is more prevalent today than it was in 1934 and thus less likely to be prejudicial.

Closing Argument

¶35 Edwards objects to Singh's attorneys referring to the instruction during oral argument, contending that such argument was prejudicial because it called attention to Edwards having insurance. But there was no objection raised at that time. Moreover, attorneys are permitted to refer to instructions during argument. Equally evident is the possibility that such an instruction called attention to the possibility that Singh was covered by insurance. The statement that "it would be unfair to Edwards" at most could be construed to remind the jury that whether Singh or Edwards had insurance was not something that should be factored into their verdict. The jury is presumed to follow the court's instructions.[29] There was no improper statement in that instruction.

Improper Question

¶36 Edwards also contends on appeal that the trial court abused its discretion in denying Edwards' motion for a new trial because of an improper question during trial. A witness was asked whether he was aware that Singh was not suing or seeking reimbursement from Providence. The following exchange occurred during Singh's cross-examination of Providence's chief executive officer (CEO), David Brooks:

Q. Hi. Mr. Brooks. How are you?

A. Good morning.

---

[28] *Graves*, 176 Wash. at 337.

[29] *A.C. v. Bellingham Sch. Dist.*, 125 Wn. App. 511, 521-22, 105 P.3d 400 (2004); *Carnation Co. v. Hill*, 115 Wn.2d 184, 186-87, 796 P.2d 416 (1990).

Q. We met, but we really haven't talked, have we?

A. No

Q. You talked about a lawsuit, suing in this case, the hospital suing in this case, correct?

A. Yes

Q. You are aware of the fact that the Singh family is not suing the hospital and cannot collect from the hospital?

A. I am.

Q. Okay. Now, as the CEO of Providence, can you tell me whether you are as high as it can go within – we talked about various vice presidents and so on in corporations, you are at the top, are you not, with the board?

Edwards did not object at trial. An objection after a question has been answered is too late.[30] Furthermore, in its ruling denying the motion for new trial, the trial court noted that Edwards had opened the door in its opening statement when it made reference to Providence's paying its fair share:[31] Providence should "bear responsibility" and "pa[y] jointly" to ensure "full[ ] compens[ation]" for the Singhs. Indeed those remarks were made when Edwards was fully aware that there would not be any judgment against Providence, both because it was now realigned as a plaintiff and because of the settlement agreement.

¶37 Furthermore, Edwards had an opportunity to cure any prejudice by introducing the settlement agreement, which it did not do.[32] In any event, there was no timely objection and the question was not so prejudicial that it would necessitate a new trial. The trial court carefully considered all of the evidence and gave thought-

---

[30] *State v. Jones*, 70 Wn.2d 591, 597, 424 P.2d 665 (1967).

[31] *Davis v. Globe Mach. Mfg. Co.*, 102 Wn.2d 68, 77, 684 P.2d 692 (1984).

[32] Edwards withdrew a curative instruction describing settlement offers.

154

ful, detailed rulings throughout trial. It did not abuse its discretion in refusing to grant a new trial.

¶38 We affirm the trial court.

BECKER and ELLINGTON, JJ., concur.