2014 AUG 11  AM 10: 33


# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| DALLAS BARNES, | ) | NO. 70801-5-I |
| Appellant, | ) ) | |
| | ) | DIVISION ONE |
| v. | ) ) | |
| THE STATE OF WASHINGTON, through WASHINGTON STATE UNIVERSITY, | ) ) ) ) | UNPUBLISHED OPINION |
| | ) | |
| Respondent. | ) | FILED: August 11, 2014 |

LEACH, J. — Dallas Barnes appeals the dismissal of his lawsuit against Washington State University (WSU or University) for racial discrimination and retaliation after an adverse jury verdict. Barnes challenges a number of the trial court's evidentiary rulings and the court's rejection of his proposed special verdict form. Because the trial court did not abuse its discretion when making the challenged evidentiary rulings and properly instructed the jury, we affirm.

## FACTS

Dallas Barnes received a BA, MA, and PhD in sociology from Washington State University in Pullman, Washington. In 1969, he began working at the WSU Pullman campus. In the early 1980s he became the coordinator of the Academic Development Program, which focused on the recruitment, advising, and retention of provisionally admitted and nontraditional students. In 1986, the University reorganized all the student advising programs, merging several programs and

creating the Student Advising and Learning Center (SALC). Barnes applied for the position of SALC director twice but did not receive an interview. In 1992, Barnes filed complaints of employment discrimination and retaliation with the Equal Employment Opportunity Office and Office of Human Development and Human Rights at WSU, as well as the Equal Employment Opportunity Commission (EEOC) in Seattle. In June 1994, the EEOC determined insufficient evidence existed to support Barnes's allegations.

In September 1994, Barnes filed a lawsuit against the University, alleging race and age discrimination and retaliation. In December 1996, the parties settled the lawsuit. As part of the settlement, Barnes received $150,000 and a position as assistant branch campus director of student affairs at the Tri-Cities campus of WSU.

Barnes began working at the Tri-Cities branch campus in 1997. In 1999, WSU appointed Pat Wright as interim director and then as director of the Office of Student Affairs. The University did not advertise the position. Barnes believed he was more qualified than Wright to serve as director.

In 2000, Chancellor Larry James relieved Barnes of certain duties as disability coordinator, following an unsatisfactorily resolved accommodation complaint by a visually impaired student. Beginning in 2006, Barnes received a series of marginal or poor performance reviews from several different supervisors.

In 2007, WSU Tri-Cities became a four-year institution. As part of this transition, the campus formalized counseling services, and Barnes's supervisors instructed him to stop personally counseling students and staff. A 2004 performance review had noted that Barnes "works well with students" and that Barnes "spends a great deal of time working with students that need counseling or someone to be an advocate for them." Barnes had a license as a registered counselor from the Washington State Department of Health from 1995 until 2010.

In 2007, the University dismissed Pat Wright and three others for fraudulently reporting enrollment numbers. Barnes was not implicated in the wrongdoing. Following Wright's dismissal, the University appointed an interim director, who served for six to eight months. In 2008, the University advertised the permanent director position, but Barnes did not apply. In June 2008, Jaime Contreras began work as director.

In July 2008, Contreras and Tri-Cities Chancellor Vicky Carwein sent Barnes a letter advising him of his assignment to the position of associate director of student services and special projects. His new duties mainly consisted of academic advising for student retention, reinstatement, and community outreach liaison work. The letter explicitly instructed Barnes to stop providing mental health, behavioral, or personal counseling services to any person.

On June 11, 2010, Barnes filed this lawsuit against the University for racial discrimination and retaliation.

In December 2010, Anna Mitson, another employee in the Office of Student Affairs, complained to the University's Office for Equal Opportunity (OEO) that Contreras, her supervisor, made racial and ethnic references toward her and others. Mitson alleged that Contreras referred to an African American employee as "Kunta Kinte" and "Thurgood Marshall" and to himself using several derogatory racial or ethnic names.[1] An OEO report in March 2011 concluded that Contreras's derogatory references to Mitson, himself, and others violated University policy prohibiting discrimination and sexual harassment.[2] Contreras resigned from his position shortly thereafter, and the University replaced him with an interim director. University administrators did not speak to Barnes about the interim director position.

In September 2011, Mitson and two other Office of Student Affairs employees filed suit against the University and Contreras, alleging a hostile work environment, racial and sexual discrimination, and retaliation.[3] The parties later settled the lawsuit.

In spring 2012, Vice Chancellor Richard Pratt transferred Barnes from the Office of Student Affairs to the Career Development Center. Barnes told Pratt that he considered this to be a demotion.

---

[1] The "Kunta Kinte" and "Thurgood Marshall" comments referred to Barnes, though Contreras never made such a reference in Barnes's presence. Barnes was not aware of Contreras's racial comments about him until he read the 2011 OEO report.

[2] OEO investigators did not interview Barnes or mention him in the report.

[3] Curtiss v. State of Washington, No. 11-2-02187-1 (Benton County Super. Ct., Wash.).

Barnes's lawsuit went to trial on August 1, 2012. The University moved to exclude (1) testimony from Barnes's expert witness, Marc Brenman; (2) a 2005 report coauthored by Brenman on racially charged incidents at the Pullman campus; (3) the OEO report addressing Mitson's complaint against Contreras; (4) evidence concerning Mitson's lawsuit against the University; and (5) the monetary sum of Barnes's 1996 settlement agreement with the University. The trial court granted the motions. On August 13, 2012, the jury returned a verdict for the University on both of Barnes's claims.

Barnes appeals.

## STANDARD OF REVIEW

We review the trial court's evidentiary decisions for abuse of discretion.[4] A court abuses its discretion when its decision is manifestly unreasonable or based upon untenable grounds or reasons.[5] We review de novo alleged errors of law in a trial court's jury instructions.[6]

## ANALYSIS

Expert Testimony

Barnes argues that the trial court erred by excluding the testimony of Marc Brenman. Brenman is a former director of the Washington Human Rights Commission and cochair of a 2005 task force that investigated and reported on

---

[4] Philippides v. Bernard, 151 Wn.2d 376, 393, 88 P.3d 939 (2004); State v. Finch, 137 Wn.2d 792, 810, 975 P.2d 967 (1999); Reese v. Stroh, 128 Wn.2d 300, 310, 907 P.2d 282 (1995).

[5] Mayer v. Sto Indus., Inc., 156 Wn.2d 677, 684, 132 P.3d 115 (2006); State ex rel. Carroll v. Junker, 79 Wn.2d 12, 26, 482 P.2d 775 (1971).

[6] State v. Porter, 150 Wn.2d 732, 735, 82 P.3d 234 (2004).

racially charged incidents among students at the WSU Pullman campus. The court excluded Brenman's testimony as overly speculative, not helpful, and invading the province of the jury. Barnes made an offer of proof that Brenman would testify to "the closed nature of academia, the subjective nature of employment decisions in universities, the pattern of discrimination at WSU, the meaninglessness of the title 'Special Projects,' and the futility of Dr. Barnes's applying for Director of Student Affairs." Barnes argues that although he "could supply his own testimony on some of the topics, the jury would have been more impressed by testimony from an expert."

Under ER 702 and 703, expert testimony is admissible if the witness's expertise is supported by the evidence, his opinion is based on facts or data reasonably relied on by the professional community, and his testimony is helpful to the trier of fact.[7] "'Courts generally interpret possible helpfulness to the trier of fact broadly and will favor admissibility in doubtful cases.'"[8] However, a court may in its discretion exclude expert testimony that concerns concepts within the commonsense understanding of jurors.[9] Trial courts have broad discretion in

---

[7] Deep Water Brewing, LLC v. Fairway Res. Ltd., 152 Wn. App. 229, 271, 215 P.3d 990 (2009).

[8] State v. Groth, 163 Wn. App. 548, 564, 261 P.3d 183 (2011) (internal quotation marks omitted) (quoting Moore v. Hagge, 158 Wn. App. 137, 155, 241 P.3d 787 (2010)).

[9] State v. Rafay, 168 Wn. App. 734, 782-83, 790, 285 P.3d 83 (2012) (affirming trial court's exclusion of expert opinion on psychology of false confessions as invading the province of the jury and well within the commonsense understanding of jurors; court's determination "at least debatable" and therefore not abuse of discretion), review denied, 176 Wn.2d 1023 (2013), cert. denied, 134 S. Ct. 170 (2013).

determining the admissibility of expert testimony under ER 702, and absent abuse of that discretion, a reviewing court does not disturb the trial court's ruling.[10]

Barnes relies heavily on a Sixth Circuit case, Davis v. Combustion Engineering, Inc.,[11] in which the court held that the trial court did not abuse its discretion in admitting expert testimony to support the plaintiff's claim of age discrimination. He also cites other cases affirming a trial court's decision to admit expert testimony but cites no case disapproving a trial court's exclusion of expert testimony. The University cites other state and federal cases affirming a trial court's decision to limit or exclude expert testimony in areas "readily within the comprehension and ability of the jury."[12]

Barnes contends that "[t]he average person or layperson has no insight" into subjects such as the closed nature of academia, subjective employment decisions, and patterns of discrimination. But he concedes that he was able to testify about these issues. Also, he does not demonstrate that they fall outside

---

[10] Philippides, 151 Wn.2d at 393.

[11] 742 F.2d 916, 919-20 (6th Cir. 1984).

[12] See, e.g., Curtis v. Okla. City Pub. Sch. Bd. of Educ., 147 F.3d 1200, 1219 (10th Cir. 1998) (concluding jury could determine for itself whether recruitment plan was evidence of retaliation); Barfield v. Orange County, 911 F.2d 644, 651 n.8 (11th Cir. 1990) (holding that opinion about whether plaintiff was victim of discrimination was properly excluded as not helpful to trier of fact); Kotla v. Regents of Univ. of Cal., 115 Cal. App. 4th 283, 293, 8 Cal. Rptr. 3d 898 (2004) (holding testimony of industrial psychologist on employment retaliation did not assist the jury in fact-finding and "created an unacceptable risk that the jury paid unwarranted deference to [the expert's] purported expertise when in reality he was in no better position than they were to evaluate the evidence concerning retaliation").

the commonsense understanding of jurors. Barnes points to the holding in <u>Davis</u> that the trial court's admission of the expert testimony was "not clearly erroneous"[13] but does not demonstrate that a court's decision to exclude similar expert testimony is an abuse of discretion. The trial court did not abuse its discretion by excluding Brenman's testimony.

<u>Defense Opening Statement and the Open Door Doctrine</u>

In its opening statement, the State referred several times to Chancellor Larry James's appointment of Pat Wright as director of student services and said James appointed Wright because she "was an out-front person. Someone who interacted well with people and had the background to do the job." Barnes contends that this created the false impression that Wright was more qualified than he for the director position and that the court should have permitted him to correct this "misrepresentation" by introducing letters of reference "available to the WSU administration, showing him to be personable and beloved by others."

In its opening statement, the State also referred to Contreras's hiring the year after the transition of WSU Tri-Cities to a four-year university: "And the freshman class came in. And by all accounts, Contreras did an excellent job." Barnes contends that this statement also opened the door to his rebuttal evidence and that the trial court erred by refusing to allow Barnes to "correct the statement by presenting testimony of witnesses to Jaime Contreras' horrible performance as a Director of Student Affairs and racist, sexist, and religiously

---

[13] <u>Davis</u>, 742 F.2d at 919.

arrogant world view." Specifically, Barnes assigns error to the trial court's decision to exclude testimony about Mitson's lawsuit and the internal investigation that preceded Contreras's resignation.

"It is well settled that any party may, in opening statement, refer to admissible evidence expected to be presented at trial."[14] Under the open door doctrine, evidence a party introduces may open the door for the other party to present evidence that would not otherwise be admissible.[15] Once a party has raised a material issue, the opposing party is generally permitted to explain, clarify, or contradict the evidence.[16]

Though the trial court did not admit Barnes's letters of recommendation as exhibits, Barnes responded to the State's opening statement by testifying about the letters and his other accomplishments. The jury heard testimony and weighed evidence of his qualifications, experience, and employment record. Barnes fails to show that the exclusion of the two letters prejudiced him.

The State's narrow comment about Contreras referred to the transition of the campus to a four-year institution and did not open the door to any and all evidence of Contreras's behavior as a supervisor.[17] Moreover, Mitson's hostile work environment lawsuit was not relevant and potentially confusing because it

---

[14] State v. Whelchel, 115 Wn.2d 708, 727, 801 P.2d 948 (1990).
[15] State v. Berg, 147 Wn. App. 923, 939, 198 P.3d 529 (2008), abrogated on other grounds by State v. Mutch, 171 Wn.2d 646, 254 P.3d 803 (2011).
[16] Berg, 147 Wn. App. at 939.
[17] The State's counsel asserted in colloquy that the purpose of his statement was to show "that [Contreras] advanced student services by all accounts, not that he was a model person or perfect in his supervision."

required proof of different elements than Barnes's disparate treatment action, which did not name Contreras.

The court concluded that "the jurors have already been told that the arguments and the statements of counsel are not evidence, so it does not open the door," and "it's not appropriate for this case to include a minitrial regarding Anna Mitson and the others who have filed a lawsuit against WSU." The court did, however, exercise its discretion to allow testimony, over the State's objection, about Contreras's racial speech targeted at himself and Barnes.[18] The trial court did not abuse its discretion.

Money Damages Sum from 1996 Settlement

At trial, the court admitted the 1996 settlement agreement resolving Barnes's earlier lawsuit against the University but granted WSU's motion to strike the words "in consideration for the sum of $150,000, paid as unspecified general damages." The court stated in a letter to the parties, "I don't believe the monetary amount of the 1996 settlement would be relevant to the current case." At trial, the court reiterated, "I don't see how whether money was paid is appropriate for the jury." The court did permit references to WSU's payment of transportation and moving costs as part of the settlement.

Under ER 402, "[e]vidence which is not relevant is not admissible." Even where evidence is relevant, "[t]he trial court has broad discretion in balancing the

---

[18] In colloquy, the court emphasized to counsel that it "was trying to balance what would be appropriate for this jury to hear to [sic] and to balance the testimony for both sides."

probative value of evidence against the potentially harmful consequences that might result from its admission."[19] Barnes does not cite any authority to support his contention that the court erred in admitting the settlement but not the amount of money damages paid. In addition, he does not demonstrate how the redaction prejudiced him. Once again, the trial court did not abuse its discretion.

Testimony about Assistant Attorney General's Instructions

At trial, after eliciting Barnes's testimony about Contreras's treatment of him, Barnes's counsel asked him, "Did you learn that the Assistant Attorney General was demanding that you stop talking to someone?" The State objected on hearsay and relevance grounds. At a sidebar, Barnes's counsel argued that this testimony would demonstrate that the University retaliated against Barnes for his advocacy for others. The trial court sustained the State's objection, explaining, "I don't see the relevance to asking your client about this statement by the Assistant Attorney General telling him to stop counseling or telling students to bring a lawsuit against WSU." Barnes argues that WSU "silenced him" because of his advocacy for others and that the trial court erred in not allowing him to pursue this claim. However, Barnes presents no argument or authority showing this testimony's relevance or its admissibility under a hearsay exception. The trial court did not abuse its discretion in excluding it.

---

[19] Lockwood v. AC&S, Inc., 109 Wn.2d 235, 256, 744 P.2d 605 (1987); ER 403.

Special Verdict Form

Barnes proposed a special verdict form containing lines for the jury to itemize front pay, back pay, and seven subcategories of emotional damages. The court rejected Barnes's form and gave the jury a special verdict form with lines for three categories: back pay, front pay, and emotional damages. The court also gave the jury separate instructions defining the pay categories and types of damages Barnes could recover, including "emotional distress, loss of enjoyment of life, humiliation, pain and suffering, personal indignity, embarrassment, fear, anxiety, and/or anguish." The court noted during the jury instruction conference that Barnes could argue the subcategories of damages: "the court is not precluding plaintiff from arguing those and even setting it out on their Power Point or on the board. You can separate those out and talk about each and every one of those."

During the jury instruction conference, the trial court pointed out to Barnes's counsel that at a previous trial over which the trial court presided and counsel appeared, counsel had argued exactly the opposite position regarding itemizing emotional damages. Barnes contends that the trial court refused to give the jury his special verdict form because his counsel previously argued against exactly this form in a different case. Barnes argues that "the court must not punish Dallas Barnes for arguments made by his counsel in another case."

"'Jury instructions are sufficient when they allow counsel to argue their theory of the case, are not misleading, and when read as a whole properly inform

-12-

the trier of fact of the applicable law. Even if an instruction is misleading, it will not be reversed unless prejudice is shown.'"[20] We review de novo alleged errors of law in a trial court's jury instructions,[21] but we review a trial court's decision whether to give a particular instruction to the jury for abuse of discretion.[22] This standard also applies to questions about the number of instructions and the specific wording of instructions.[23]

The court's instruction was consistent with Washington pattern jury instructions.[24] The instructions as a whole properly informed the jury of the applicable law, and Barnes had the opportunity to argue his damage theory of the case. The trial court did not err or abuse its discretion in refusing Barnes's proposed special verdict form. And because the jury returned a verdict for the University, it did not need to calculate damages. Barnes makes no showing that the court's refusal to give his proposed damage instruction affected the liability verdict. Thus, he shows no prejudice.

---

[20] Singh v. Edwards Lifesciences Corp., 151 Wn. App. 137, 150-51, 210 P.3d 337 (2009) (internal quotation marks omitted) (quoting Keller v. City of Spokane, 146 Wn.2d 237, 249-50, 44 P.3d 845 (2002)).

[21] Porter, 150 Wn.2d at 735.

[22] Stiley v. Block, 130 Wn.2d 486, 498, 925 P.2d 194 (1996).

[23] Hue v. Farmboy Spray Co., 127 Wn.2d 67, 92, 896 P.2d 682 (1995).

[24] 6B DAVID K. WOLFE, WASHINGTON PRACTICE: CIVIL JURY INSTRUCTION HANDBOOK § 10.4, at 855, § 10.6 at 880 (2013).

Cumulative Error

Finally, Barnes argues that "[t]he Superior Court's cumulative errors prejudiced the outcome of the trial." Because Barnes has failed to show any error, his claim of cumulative error fails.[25]

Attorney Fees

The University has requested an award of attorney fees and costs on appeal under RAP 18.1. At trial, the court awarded the University statutory fees and costs. As the prevailing party, the University is entitled to recover its statutory costs as provided in RCW 4.84.080(2) and RAP 14.3. We award statutory fees and costs upon the University's compliance with RAP 14.4.

CONCLUSION

Because the trial court did not abuse its discretion when making its evidentiary rulings and properly instructed the jury, we affirm. We award the University its statutory fees and costs upon compliance with RAP 14.4.

_Leach, J._

WE CONCUR:

_Appelwick, J._        _Becker, J._

---

[25] See State v. Price, 126 Wn. App. 617, 655, 109 P.3d 27 (2005); State v. Stevens, 58 Wn. App. 478, 498, 794 P.2d 38 (1990).