# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| TANESSA DESRANLEAU, individually and as the Personal Representative of the ESTATE of JAY'BREON DESRANLEAU, <br><br> Appellant, <br><br> v. <br><br> HYLAND'S, INC., STANDARD HOMEPATHIC LABORATORIES, INC., and STANDARD HOMEPATHIC COMPANY, and MICHELLE REID, <br><br> Respondents. | No. 78343-2-I <br><br> DIVISION ONE <br><br> PUBLISHED OPINION <br><br> FILED: October 21, 2019 |

MANN, A.C.J. — Tanassa Desranleau appeals the trial court's decision on summary judgment dismissing her claims against Hyland's, Inc., and its parent companies Standard Homepathic Laboratories, Inc., and Standard Homepathic Company (collectively, Hyland's) alleging that it caused the death of Desranleau's infant son Jay'Breon. Desranleau argued that Hyland's manufacturing process is flawed resulting in individual tablets containing toxic levels of chemical components and that Jay'Breon's ingestion of such a toxic tablet caused his death.

The trial court dismissed Desranleau's claims after it determined that there was no admissible evidence that Jay'Breon actually ingested Hyland's cold medicine or that the cold medicine was the probable cause of his death. Because when viewed in the light most favorable to Desranleau there are material questions of fact, we reverse the dismissal of Desranleau's claims under the Washington Products Liability Act (WPLA), ch. 7.72 RCW. We affirm dismissal of Desranleau's claims under the Consumer Protection Act (CPA), ch. 19.86 RCW and her request for punitive damages under California law.

I

On January 18, 2014, 13-month-old Jay'Breon was found dead in his crib. Prior to his death, Jay'Breon had been suffering from a cold, so his caregiver Michelle Reid—Jay'Breon's father's girlfriend—gave him cold medicine earlier that morning. At about 6 a.m. on January 18th, Reid awoke to hear that Jay'Breon's chest was still congested. She gave him a dose of children's Tylenol and a banana before going back to sleep. Reid and Jimi Williams, Jay'Breon's father, awoke at 9:15 a.m. and saw that Jay'Breon was still asleep. Reid did not specifically check on him to avoid waking him up. Reid and Williams were in the living room for about 30 minutes when Reid went back into the bedroom to get ready for work. Reid found Jay'Breon face down in his crib, with his head covered by a blanket. Reid immediately noticed Jay'Breon was blueish in color and not breathing. Reid, her roommate Nageisha Tramble, and a neighbor, attempted to do CPR on Jay'Breon until the ambulance arrived. By this time, Williams had left the scene. The fire department attempted CPR on Jay'Breon but determined that he was deceased. Reid told police officers that "she was giving

[Jay'Breon] Highlands (sic) tablets, children's cold medicine, for the same amount of time that he'd been having symptoms of a cold . . . she had been giving him about 8 tablets per day and that the last time she gave him 2 tablets was the night prior at [9 p.m.]" Reid fully cooperated with police and consented to a taped interview.

The King County Medical Examiner investigated Jay'Breon's death. After an autopsy, the medical examiner concluded that Jay'Breon's body was normally developed, but waited to determine an official cause of death until his toxicology screening was finished. The toxicology report for Jay'Breon came back unremarkable, so the medical examiner concluded that Jay'Breon's official cause of death was sudden unexpected infant death.

Three years later, Desranleau sued Hyland's and Reid. Desranleau alleged that Hyland's knowingly sold toxic and dangerous homeopathic medicines for children, the ingestion of which caused Jay'Breon's death. This, Desranleau alleged, was a violation of the WPLA and the CPA. Desranleau requested punitive damages under California law.

Hyland's manufacturers various types of homeopathic medicines, using the same general manufacturing process. Hyland's dilutes various products using a dry-dilution process, where a quantity of an ingredient is mixed with a "diluent" over and over again until the desired concentration is achieved.

In 2012, the United States Food and Drug Administration (FDA) informed Hyland's that it was concerned with Hyland's dilution process related to a separate product. The FDA wrote that Hyland's dilution process may lead to batch stratification— where some tablets within a single batch have significantly higher concentrations of an

ingredient than others. The FDA recommended a liquid dilution process rather than a dry dilution process. These concerns remained in 2017, when the FDA again informed Hyland's that it was concerned with their manufacturing process. The FDA wrote:

> You manufacture drug products . . . from ingredients that pose potentially toxic effects. Specifically, Hyland's Baby Teething Tablets and Hyland's Baby Nighttime Teething Tablets contain belladonna[1] and are marketed for vulnerable patient populations, including infants and children. . . .
>
> FDA's analysis of samples of your [products] . . . found that the alkaloid content far exceeded the claim on your label . . . . The testing found inconsistency in levels of belladonna, a toxic substance, and reveals that your manufacturing process is poorly controlled and may pose unnecessary risk to infants and children.

Though the FDA's concerns were specifically related to stratification of belladonna in Hyland's teething products, and belladonna is not contained in Hyland's cold medicines, Hyland's admitted that its manufacturing process is substantially similar in all of its products. Therefore, Desranleau alleges that stratification of the alkaloid *gelsemium sempervirens*, which can be toxic in high doses and is found in Hyland's cold medicines, likely also occurs. The possibility of stratification coupled with the potential for *gelsemium sempervirens* to be toxic in high doses is what Desranleau alleges caused Jay'Breon's death.

Hyland's moved for summary judgment arguing primarily that Desranleau was unable to provide any admissible evidence that Hyland's medicines caused Jay'Breon's death. Hyland's also argued that Desranleau could not recover punitive damages under either California or Washington law, and that she could not recover under the CPA.

The trial court heard argument on Hyland's motion on April 13, 2018. The court began the hearing by warning "the most serious issue here is that we don't have

---

[1] Belladonna is an alkaloid substance that can be harmful in large doses.

admissible evidence . . . that this child even consumed the [Hyland's] cold pills." Consistent with its warning, the court ruled in Hyland's favor upon finding that Desranleau had not produced any admissible evidence that "Reid actually provided the Hyland's Tiny Cold tablets to Jay'Breon."[2]

Desranleau appeals.

## II.

We review summary judgment orders de novo, engaging in the same inquiry as the trial court. Summary judgment is warranted only when there is no genuine dispute of material fact and the moving party is entitled to judgment as a matter of law. CR 56(c). The facts and all reasonable inferences are viewed in the light most favorable to the nonmoving party. Young v. Key Pharmaceuticals, Inc., 112 Wn.2d 216, 225-26, 770 P.2d 182 (1989).

The moving party for summary judgment bears the initial burden of showing the absence of an issue of material fact. Young, 112 Wn.2d at 225. "If the moving party is a defendant and meets this initial showing, then the inquiry shifts to the party with the burden of proof at trial, the plaintiff." Id. If the plaintiff "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial," then the trial court should grant the motion. Young, 112 Wn.2d at 225 (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552, 91 L. Ed. 2d 265 (1986)). Only admissible evidence can be considered in reviewing a motion for summary judgment. See Lynn v. Labor Ready, Inc., 136 Wn. App. 295, 306, 151 P.3d 201 (2006).

---

[2] Reid did not participate below and is not a party to this appeal.

III.

To bring a claim under the WPLA, the plaintiff must establish that his or her harm was proximately caused by the condition of the manufacturer's product. See RCW 7.72.030(1) ("a product manufacturer is subject to liability . . . if the claimant's harm was proximately caused by the negligence of the manufacturer in that the product was not reasonable safe as designed."). "Proximate cause is ordinarily a question for the jury, [but] when the facts are undisputed and the inferences therefrom are plain and incapable of reasonable doubt or difference of opinion [] it may be a question of law for the court." Fabrique v. Choice Hotels Intern., Inc., 144 Wn. App. 675, 683, 183 P.3d 1118 (2008).

To establish causation, Desranleau relied on two propositions. First, Desranleau relied on Reid's statements to the police that she had given Jay'Breon Hyland's cold medicine to prove that Jay'Breon ingested Hyland's cold medicine prior to his death. Second, Desranleau relied upon Dr. Pietruszka's expert opinion to prove that Hyland's cold medicine was the cause of Jay'Breon's death.

A.

The trial court determined that Reid's statements to the police officers were inadmissible hearsay. Hearsay is "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." ER 801. Hearsay is inadmissible unless covered by a recognized exception. ER 802. Since Desranleau was attempting to rely on Reid's statements for the truth of the matter asserted—that Reid administered Jay'Breon Hyland's cold medicine—Reid's statements were hearsay. See State v. Hines, 87 Wn. App. 98, 941 P.2d 9 (1997)

(holding that the admission of a police officer's investigation report was error because it was hearsay not covered by an applicable exception).

Desranleau argues that Reid's statements are not hearsay because they are admissions by a party-opponent. ER 801(d)(2) provides that a statement is not hearsay if it is "offered against a party and is (i) the party's own statements . . . or (ii) a statement of which the party has manifested an adoption or belief in its truth." Desranleau contends that because Reid is a codefendant ER 801(d)(2) applies to her statements.

But Desranleau ignores that even though Reid is a codefendant in this suit, under ER 801(d)(2), Reid's statements could only be used against her; they could not be used against Hylands. See ER 801(d)(2) (a statement is not hearsay if "offered against a party and is . . . the party's own statements.") (Emphasis added). See also Feldmiller v. Olson, 75 Wn.2d 322, 324, 450 P.2d 816 (1969) ("statements made by Mr. Olson may or may not be admissions on his part against him. They are admissible as evidence only against him (Olson) and they would not be evidence against the other defendant Leonard.") (alteration in original). Therefore, Reid's statements are not admissible against Hyland's under ER 801(d)(2).

Desranleau also incorrectly argues that because Dr. Pietruszka relied on Reid's statements when forming his opinion, those statements became admissible evidence under ER 703. ER 703 allows an expert witness to base their opinion on facts or data regardless of their admissibility, and ER 705 provides that an expert may be required to disclose the underlying facts or data upon which their opinion is based, but neither provides that inadmissible statements become substantively admissible simply because an expert relied upon them in forming their conclusions. See State v. Anderson, 44 Wn.

-7-

App. 644, 652, 723 P.2d 464 (1986) (ER 705 is not "a mechanism for admitting otherwise inadmissible evidence as an explanation of the expert's opinion.").[3]

But even though the trial court correctly identified Reid's statements as hearsay,[4] the trial court did not provide Desranleau with the benefit of all reasonable inferences. When viewing the evidence and all reasonable inferences therefrom in the light most favorable to Desranleau, there are material questions of fact as to whether Jay'Breon ingested Hyland's cold medicine. Young, 112 Wn.2d at 226.

It was undisputed that Jay'Breon had a cold for the few days prior to his death. Hyland's admits as such in its briefing to this court, and the medical examiner's report described Jay'Breon's lungs at the time of his death as congested.

There was also evidence that the police recovered Hyland's infant cold medicine from the scene: Officer Rego reported that he recovered cold medications from the scene and booked them into evidence, and the police report contains an evidence description of cold medications with the brands "Tylenol & Hyla." This evidence was retained by the police and later transferred to Hyland's counsel.[5] Further, Officer Mickelsen reported that while photographing the kitchen and dining room, he located numerous medications on the counter that were prescribed to the other residents of the house.

---

[3] See also State v. Lui, 153 Wn. App. 304, 321, 221 P.3d 948 (2009) ("ER 705 gives the trial court discretion to permit an expert to relate hearsay or otherwise inadmissible evidence to the jury for the limited purpose of explaining the reasons for his or her opinion"); In re Detention of Coe, 175 Wn.2d 482, 504, 286 P.3d 29 (2012) (holding that because the trial court admitted hearsay evidence for substantive purposes, the Court of Appeals erred when it reasoned the under ER 703 the hearsay evidence was admissible).

[4] Though, of course, this evidence may still be admissible at trial through the testimony of Reid or through an otherwise recognized exception to the hearsay rule not addressed herein. See, e.g., ER 803.

[5] Though whether the trial court was aware of the fact that Hyland's counsel had the medications recovered from the scene during summary judgment is unclear.

Even without Reid's statements, it would be reasonable for a jury to infer that Jay'Breon ingested Hyland's cold medicine from the chain of circumstantial evidence. First, Jay'Breon had a cold leading up to his death. Second, an open bottle of Hyland's cold medicine—specifically designed for infants who were experiencing a cold—was recovered from the scene. Third, the police found this medicine in a separate location from the other household occupant's medications, indicating that it was not their medication. And fourth, the police recovered this medication as evidence from where Jay'Breon was found. There was enough circumstantial evidence in the record, when viewed in the light most favorable to Desranleau, for a jury to find that Jay'Breon ingested Hyland's cold medicine.

B.

Desranleau also offered Dr. Pietruszka's expert opinion to establish that Hyland's products contained potentially lethal doses of alkaloids and therefore were likely the cause of Jay'Breon's death. Hyland's argues on appeal that we should disregard Dr. Pietruszka's opinion and that because Dr. Pietruszka's opinion should be excluded, Desranleau cannot establish legal causation.

But Hyland's bases its argument on fact based questions—such as whether Dr. Pietruszka relied on improper information in reaching his conclusion, and whether he adhered to the proper scientific method. This indicates that material questions of fact remain as to whether Dr. Pietruszka's opinions properly conclude that Hyland's products caused Jay'Breon's death.

Further, Hyland's asks this court to rule on the credibility of Dr. Pietruszka. The trial court did not rule on the admissibility of Dr. Pietruszka's opinions. See Volk v.

DeMeerleer, 187 Wn.2d 241, 277, 386 P.3d 254 (2016) ("[a]dmission [of an expert witness] is proper provided the expert is qualified and his or her testimony is helpful [to the trier of fact.]").

The medical examiner ruled out numerous causes of death including asphyxiation, hyperthermia, and other natural causes of death other than sudden infant death syndrome. But the medical examiner did not have the benefit of the information about Hyland's cold medicine available to him when he conducted his investigation; Dr. Pietruszka did. As this is a review of a summary judgment order, where we view all of the evidence and reasonable inferences from the record in the light most favorable to Desranleau, we cannot conclude, as a matter of law, that Dr. Pietruszka's expert opinions should be disregarded.

"Proximate cause is ordinarily a question for the jury." Fabrique, 144 Wn. App. at 683. Since here "the facts are []disputed and the inferences therefrom are [not] plain and incapable of reasonable doubt or difference of opinion,"[6] we reverse. Desranleau rebutted Hyland's motion for summary judgment with sufficient evidence to reach the trier of fact on the questions of whether Jay'Breon consumed Hyland's cold medicine before his death and whether that medicine was the cause of his death.

III.

Desranleau requested punitive damages under California law because Hyland's is a California company and manufacturers all of its products in California. See Singh v. Edwards Lifesciences Corp., 151 Wn. App. 137, 140, 210 P.3d 337 (2009) ("where, as here, an entity headquartered in California, committed the conduct in California that

---

[6] Fabrique, 144 Wn. App. at 683.

resulted in the plaintiff's damages, California had the greater interest in deterring such . . . activities."). But even if we assume California law applies, Desranleau's claim is barred by California's two-year statute of limitations. Cal. Civ. Proc. Code § 335.1.

Jay'Breon died on January 18, 2014, therefore any claims he or his estate had related to his death accrued on that date. See Atchison v. Great Western Malting Co., 161 Wn.2d 372, 374-75, 166 P.2d 662 (2007) (statute of limitations for wrongful death action began to run upon the decedent's death). Desranleau did not file her complaint until January 3, 2017; nearly three years later. Therefore, the California statute of limitations bars Desranleau's claim for punitive damages.

Desranleau tries to avoid this result by arguing that the discovery rule should apply to her claim and toll the statute of limitations until 2016 when she first met with her attorney and discovered that Hyland's could potentially be liable for Jay'Breon's death. But our Supreme Court has already rejected that argument. See Reichelt v. Johns-Manville Corp., 107 Wn.2d 761, 772, 733 P.2d 530 (1987) ("Mr. Reichelt would have us adopt a rule that would in effect toll the statute of limitations until a party walks into a lawyer's office and is specifically advised that he or she has a legal cause of action; that is not the law.").[7]

Desranleau knew of the damages that she and Jay'Breon suffered in 2014. While she may not have known that she had a potential cause of action against Hyland's until after meeting with her legal counsel, that cannot save her claim. "A party

---

[7] And Desranleau waived this argument by only mentioning it in a footnote of her opening brief and not substantively arguing her point until her reply brief. See State v. Johnson, 69 Wn. App. 189, 194 n.4, 847 P.2d 960 (1993) ("placing an argument . . . in a footnote is, at best, ambiguous or equivocal as to whether the issue is truly intended to be part of the appeal.") and Cowiche Canyon Conservancy v. Bosley, 118 Wn.2d 801, 809, 828 P.2d 549 (1992) ("[a]n issue raised and argued for the first time in a reply brief is too late to warrant consideration.").

must exercise reasonable diligence in pursuing a legal claim. If such diligence is not exercised in a timely manner, the cause of action will be barred by the statute of limitations." Reichelt, 107 Wn.2d at 772.

IV.

To establish a CPA violation, a private plaintiff must prove "(1) an unfair or deceptive act or practice; (2) which occurs in trade or commerce; (3) that impacts the public interest; (4) which causes injury to the plaintiff in his or her business or property; and (5) which injury is causally linked to the unfair or deceptive act." Washington St. Physicians Ins. Exchange and Ass'n v. Fisons Corp., 122 Wn.2d 299, 312, 858 P.2d 1054 (1993). "The causation requirement is met where the defendant induced the plaintiff to act or refrain from acting." Robinson v. Avis Rent a Car System, 106 Wn. App. 104, 113, 22 P.3d 818 (2001).

Desranleau's CPA claim fails as a matter of law because she cannot establish that Hyland's induced her to do anything. Desranleau admitted below that she never purchased any Hyland's product or even heard of Hyland's before this suit. Therefore, Desranleau cannot establish that Hyland's induced her to act or refrain from acting, and as such she cannot establish a prima facie case for a violation of the CPA.

We reverse and remand the trial court's grant of summary judgment on Desranleau's WPLA claim, but affirm the trial court's grant of summary judgment on Desranleau's punitive damages and CPA claims.

No. 78343-2-I/13

WE CONCUR:

_Maxon, ACJ._

_Dwyer, J._

_Schirelle, J_