IN THE COURT OF APPEALS FOR THE STATE OF WASHINGTON

| | |
|---|---|
| STACIE CAVNER and PRESTON CAVNER, husband and wife, and parents of HUDSON CAVNER and MYLES CAVNER, minors; RACHEL ZIENTEK, a single woman; TAMMY ZIENTEK and MICHAEL ZIENTEK, husband and wife, and parents of Rachel Zientek; THE ESTATE OF MYLES CAVNER, by its personal representative CAROLANN O'BRIEN STORLI; CAROLANN O'BRIEN STORLI, as litigation guardian ad Litem for HUDSON CAVNER, a minor, | No. 76178-1-I<br><br>DIVISION ONE<br><br>UNPUBLISHED OPINION |
| Appellants/Cross-Respondents, | |
| v. | |
| CONTINENTAL MOTORS, INC., a foreign corporation, | |
| Respondent/Cross-Appellant, | |
| NORTHWEST SEAPLANES, INC., a Washington corporation; and ACE AVIATION, INC., a Washington corporation, | |
| Defendants. | FILED: March 18, 2019 |

ANDRUS, J. — Preston Cavner, his wife, son, and babysitter were seriously injured, and another son killed, when the single-engine Cessna airplane Preston piloted crashed on takeoff from an Anchorage, Alaska airport. Two families sued

IN THE COURT OF APPEALS FOR THE STATE OF WASHINGTON

| | |
|---|---|
| STACIE CAVNER and PRESTON CAVNER, husband and wife, and parents of HUDSON CAVNER and MYLES CAVNER, minors; RACHEL ZIENTEK, a single woman; TAMMY ZIENTEK and MICHAEL ZIENTEK, husband and wife, and parents of Rachel Zientek; THE ESTATE OF MYLES CAVNER, by its personal representative CAROLANN O'BRIEN STORLI; CAROLANN O'BRIEN STORLI, as litigation guardian ad Litem for HUDSON CAVNER, a minor, | No. 76178-1-I <br><br> DIVISION ONE <br><br> UNPUBLISHED OPINION |
| Appellants/Cross-Respondents, | |
| v. | |
| CONTINENTAL MOTORS, INC., a foreign corporation, | |
| Respondent/Cross-Appellant, | |
| NORTHWEST SEAPLANES, INC., a Washington corporation; and ACE AVIATION, INC., a Washington corporation, | |
| Defendants. | FILED: _____ |

ANDRUS, J. — Preston Cavner, his wife, son, and babysitter were seriously injured, and another son killed, when the single-engine Cessna airplane Preston piloted crashed on takeoff from an Anchorage, Alaska airport. Two families sued

the aircraft engine manufacturer, Continental Motors, Inc. (CMI), under Washington's Product Liability Act, Chapter 7.72 RCW, alleging design and manufacturing defect claims and a failure to warn claim. After CMI alleged that pilot error caused the crash, Stacie, Hudson, and Myles's estate asserted a contingent cross-claim against Preston.

The trial court dismissed the design defect claim based on Estate of Becker v. Avco Corp., 192 Wn. App. 65, 365 P.3d 1273 (2015) (holding airplane design defect claim preempted by federal aviation law). The parties tried the manufacturing defect and failure to warn claims against CMI and the cross-claim against Preston. The jury exonerated CMI of any liability and found Preston 100 percent at fault for the crash.

Plaintiffs appeal, seeking a new trial on all claims, and CMI cross-appeals certain legal rulings in the event we remand any claim for trial.

We reverse the dismissal of Plaintiffs' design defect claim. We affirm the jury's finding that Preston was negligent and that his negligence was a proximate cause of the crash. We affirm the jury's findings for CMI on the manufacturing defect and failure to warn claims. We remand for a trial limited to the question of whether CMI's engine was not reasonably safe as designed, whether any design defect was a proximate cause of the crash, and if so, how much fault to allocate between CMI and Preston Cavner.

## FACTS

Stacie and Preston Cavner own a lodge in remote Alaska. Preston, a licensed pilot, regularly flew to the lodge from an Anchorage, Alaska airport. In

March 2010, Preston purchased a 1976 Cessna U206F airplane in Washington for his family's use at the lodge. The Cessna had a six cylinder engine, model no. IO-520-F, manufactured by Alabama-based CMI.

Because the Cessna U206F is considered a "high performance airplane," Preston needed additional instruction before he could obtain a Federal Aviation Administration (FAA) endorsement to act as pilot in command of this model of plane. Preston hired an instructor to travel with him as he flew the plane from Washington to Alaska to provide the requisite instruction. Preston experienced no problems with the plane's engine while en route to Alaska. He then used the plane almost daily between March 2010 and June 1, 2010, without incident.

On May 31, 2010, Preston and his family flew to Anchorage to pick up Rachel Zientek, a 16-year-old family friend who planned to stay with them for the summer to look after the children. The following day, Preston loaded the plane with lumber, tile, grout, groceries, luggage, and other family possessions to deliver to the lodge. He fueled the plane and loaded his passengers. Stacie sat in the front passenger seat, holding Myles, age 4, in her lap. Rachel sat in the seat behind Preston, holding Hudson, age 2, in her lap.

On takeoff, the plane lifted off, flew approximately one half mile, and crashed into an abandoned building. A fire engulfed the plane, killing Myles. Stacie sustained a collapsed lung, and severe burns over her entire body, leading to the amputation of her legs below the knee and of a part of her right hand. Hudson sustained severe burns on his head, ear, shoulder, forearm, left hand, and right foot. Preston had extensive facial injuries and burns to his legs, and lost the

sight in his right eye. Rachel's injuries included vertebral fractures, third degree burns to her arms, and more severe burns to her legs, specifically her feet and ankles, which resulted in removal of all ten toes.

In May 2012, Plaintiffs, Preston, Stacie, and Hudson Cavner, the Estate of Myles Cavner, Rachel Zientek, the babysitter, and her parents, Tammy and Michael Zientek, filed suit against CMI.[1] They alleged that CMI was liable for the plane crash because the engine components were not safe as designed or manufactured, and that CMI failed to provide adequate instructions on how to properly test for adequate compression in the engine's cylinders. Plaintiffs also named as defendants Ace Aviation, Inc. and Northwest Seaplanes, alleging they failed to detect unreasonably low compression in the engine's cylinders during inspections. Plaintiffs settled with these defendants before trial.

CMI contended Preston overloaded the plane, failed to load it properly to ensure an appropriate center of gravity, failed to secure the load which shifted during the crash, pinning the passengers, and misused the wing flaps during takeoff. CMI alleged Preston's negligence was the sole cause of the crash. Stacie, Hudson, and Myles's estate filed a contingent cross-claim against Preston.[2]

Before trial, this court held that a claim of design defect in an aircraft fuel system was preempted by federal law. Becker, 192 Wn. App. at 79. Based on the

---

[1] Where necessary, this opinion refers to the plaintiffs by their first names for convenience and clarity.

[2] The Zienteks did not assert a cross-claim against Preston because they sued Preston in state court in Texas and settled their claims in 2012.

Court of Appeals decision in Becker, the trial court dismissed Plaintiffs' design defect claim, and excluded evidence of engine design defects as irrelevant, except as relevant to the Plaintiffs' failure to warn claim.

During a three-month trial, the parties presented competing experts who opined on the existence of manufacturing defects, the adequacy of CMI's instructions to mechanics for diagnosing cylinder compression problems, and causation.

Plaintiffs' manufacturing defect claim was based on expert testimony that there were metal "burrs" (sharp metal edges) in check ball housings in the cylinders, a defect in the manufacturing process. Their experts testified that the presence of burrs violated CMI's design specifications. They opined that burrs break off and lodge between the check ball and its seat, making the valves inoperable. One expert, Donald Sommer, testified the metal burrs caused the valves in Preston's engine to seal improperly, leading to a loss of engine power and ultimately the crash.

CMI presented evidence that a post-crash examination of the check ball housings revealed no burrs present in the cylinders. CMI's experts testified that even if burrs were present, they would have been caught in the engine's oil filter and would have been too small to cause engine failure.

Plaintiffs based their failure to warn claim on CMI's decision to depart from an aviation industry compression test and to develop its own protocol for evaluating the adequacy of cylinder compression in its engine. Plaintiffs' experts opined that

CMI failed to warn of compression problems with this model of engine and that CMI promoted the use of an unsafe compression testing protocol.

CMI disputed Plaintiffs' evidence that its compression testing protocol was inadequate. It presented evidence that the protocol was supported by engineering tests, had been approved by the FAA, and had been in use for decades.

The parties also disputed the cause of the plane crash. Plaintiffs' experts testified that Preston's Cessna crashed because the engine lost cylinder compression and could not develop full power. They attributed the loss of compression to defective valve lifters and the presence of burrs in the check ball housings. But CMI presented expert testimony that post-crash testing proved the engine had the capability of developing full power, and that the valve lifters operated without problems. CMI also presented testimony from several eyewitnesses of the crash who did not see or hear anything suggesting the plane lost power while in flight.

To support its claim that pilot error caused the crash, CMI presented evidence that Preston loaded the Cessna in excess of the maximum allowable gross takeoff weight of 3,600 pounds, violating FAA regulations and the pilot operating handbook for this plane.[3] CMI also presented evidence that Preston failed to calculate the center of gravity and failed to balance the load to maintain the appropriate center of gravity.

---

[3] Like an automobile manual, each plane has a flight manual, or pilot operating handbook, unique to the plane it accompanies.

Plaintiffs' experts did not dispute that Preston overloaded the plane. While they disagreed as to the exact weight of the fully loaded plane, all agreed the plane, with passengers and cargo, was at least 471 pounds overweight. Nevertheless, the parties disputed whether Preston's overloading the Cessna rendered the plane unsafe to fly. CMI's experts testified that the FAA, by setting a maximum takeoff weight of 3,600 pounds, determined flying that model of plane above its weight limit was not safe. Plaintiffs' experts disagreed that the plane was unsafe to fly and testified that Preston's overloading the plane did not cause the accident.

CMI's experts also testified that Preston's use of wing flaps during takeoff contributed to the crash. Preston testified he set the wing flaps at 30 degrees on takeoff. According to CMI's experts, the maximum flap angle allowed by the FAA on takeoff is 20 degrees if the plane is at or below the maximum gross takeoff weight. Further complicating the situation, Preston had hired a mechanic to install a fiberglass exterior cargo carrier, known as a "belly pod," on his plane. The belly pod manufacturer issued a supplemental pilot operating handbook that specified the maximum flap deflection on takeoff for a plane modified with its belly pod could be no greater than 10 degrees for any takeoff weight in excess of 3,450 pounds. Preston did not follow this operating procedure.

While CMI presented evidence that operating the plane with 30 degrees of flap angle rendered the plane unsafe and unairworthy, Plaintiffs' experts testified that a Cessna U206F equipped with a belly pod is capable of flying safely with 30 degrees of flap. Plaintiffs' experts also opined that misuse of the flaps on takeoff did not cause the accident.

The jury found against Plaintiffs on their manufacturing defect and failure to warn claims. It found no negligence on the part of Stacie, and found Preston 100 percent at fault for the crash. The jury found the Plaintiffs had the following damages: $4,265,768 for Hudson, $3,785,621 for Rachel, $1 million for each of Rachel's parents, $493,000 for Myles's estate, $4,119,724 for Preston, and $6,086,705 for Stacie. The trial court entered judgments in favor of the Cavner family members against Preston. Plaintiffs' claims against CMI were dismissed.

ANALYSIS

A. Dismissal of Design Defect Claim

After trial, the Washington Supreme Court reversed Becker, holding the Federal Aviation Act and FAA regulations did not preempt design defect claims under Washington's Product Liability Act. Estate of Becker v. Avco Corp., 187 Wn.2d 615, 623-24, 387 P.3d 1066 (2017). Because the law changed between the time of trial and this appeal, we conclude Plaintiffs' design defect claim must be reinstated.

CMI argues remand is not warranted because the jury determined Preston's negligence was the sole cause of the crash, and Plaintiffs cannot, as a matter of law, establish any design defect proximately caused the crash. But the jury's proximate cause finding would preclude remand only if we could conclude the jury's finding would have been the same had the design defect claim been presented to it. See McDaniel v. City of Seattle, 65 Wn. App. 360, 369, 828 P.2d 81 (1992) (jury finding of probable cause to arrest plaintiff rendered dismissal of

malicious prosecution claim harmless error because jury's finding went to element of dismissed claim). We cannot reach such a conclusion here.[4]

Plaintiffs alleged the engine's cylinders and valve lifters were defective in design. Although some of this evidence may have been presented at trial in the context of the experts' discussion of the failure to warn claim and causation, the jury rendered no finding as to the existence of a design defect. The jury was only asked whether the engine was "not reasonably safe in construction" based on a manufacturing defect claim under RCW 7.72.030(2). Plaintiffs' design defect claim arose under RCW 7.72.030(1). The standard jury instructions for manufacturing defect claims and design defect claims differ materially. See 6 WASHINGTON PRACTICE: WASHINGTON PATTERN JURY INSTRUCTIONS: CIVIL 110.01, 110.02 (6th ed. 2017). The jury was not asked whether CMI's engine was "not reasonably safe as designed." Therefore, we cannot conclude as a matter of law that the jury's causation finding precludes Plaintiffs' design defect claim. Without knowing whether the jury would have found a design defect, we cannot assume the jury would have determined that such a design defect, if any, was not a proximate cause of the crash.

Plaintiffs argue if we remand the design defect claim for trial, we must vacate the jury's determination that Preston was 100 percent at fault for the crash because the jury was not asked to compare his fault with that of CMI in the context

---

[4] At oral argument, the parties contested whether the evidence supporting Plaintiffs' design and manufacturing defect claims was the same. After oral argument, Plaintiffs moved for leave to supplement the clerk's papers with a copy of CMI's Motion to Determine that Federal Law Applies to the Standard of Care. We hereby grant that motion.

of an alleged design defect. We agree. Generally, where two issues are so intertwined a jury could not fairly decide one in isolation without danger of injustice to the other, the new trial must be had on both issues. Walker v. State, 67 Wn. App. 611, 622, 837 P.2d 1023 (1992), rev'd on other grounds, 121 Wn.2d 214, 848 P.2d 721 (1993). Here, if a jury determines a design defect exists and that defect was a proximate cause of the crash, the jury must also determine the appropriate allocation of fault between CMI and Preston. Vacating the jury allocation of fault against Preston does not lead us to reverse any of the jury's other findings. We address the appropriate scope of remand below.

B. Choice of Law

Because we reinstate the design defect claim, we must address CMI's cross-appeal on the appropriate choice of law. CMI contends the trial court erred in applying Washington law to this case. This court conducts a de novo review of a trial court's decision regarding its conflict of law analysis. Williams v. Leone & Keeble, Inc., 170 Wn. App. 696, 704, 285 P.3d 906 (2012).

CMI argues Alaska law should govern because the place of injury is presumptively conclusive. We disagree. Washington has abandoned the lex loci delicti rule and follows the "most significant relationship test" from the Restatement (Second) of Conflict of Laws. Singh v. Edward Lifesciences Corp., 151 Wn. App. 137, 143, 210 P.3d 337 (2009); Zenaida-Garcia v. Recovery Sys. Tech., Inc., 128 Wn. App. 256, 261-62, 115 P.3d 1017 (2005).

Under this test, when a conflict exists, Washington courts decide which law applies by determining which jurisdiction has the most significant relationship to a

given issue. <u>Singh</u>, 151 Wn. App. at 143. There is an actual conflict here because Alaska has abolished joint liability, Alaska Stat. § 09.17.080(d), while Washington law provides for joint liability in cases where the plaintiffs are fault-free, RCW 4.22.070. Alaska also caps noneconomic damages, while Washington does not. <u>Compare</u> Alaska Stat. § 09.17.010 (capping noneconomic damages in personal injury cases resulting in severe permanent physical impairment or disfigurement to $1 million or $25,000 multiplied by the person's life expectancy, whichever is greater), <u>with</u> <u>Sofie v. Fibreboard Corp.</u>, 112 Wn.2d 636, 669, 771 P.2d 711 (1989) (holding cap on noneconomic damages unconstitutional under article I, section 21 of Washington State Constitution).

Because there is an actual conflict in applicable law, we must evaluate the contacts both quantitatively and qualitatively. <u>Woodward v. Taylor</u>, 184 Wn.2d 911, 917, 366 P.3d 432 (2016); <u>Singh</u>, 151 Wn. App. at 143. We evaluate the contacts for their relative importance to the issue, including "(a) the place where the injury occurred, (b) the place where the conduct causing the injury occurred, (c) the domicile, residence, nationality, place of incorporation and place of business of the parties, and (d) the place where the relationship, if any, between the parties is centered." <u>Zenaida-Garcia</u>, 128 Wn. App. at 260 (quoting <u>Johnson v. Spider Staging Corp.</u>, 87 Wn.2d 577, 581, 555 P.2d 997 (1976)). "If the contacts are evenly balanced, the second step of the analysis involves an evaluation of the interests and public policies of the concerned states to determine which state has the greater interest in determination of the particular issue." <u>Id.</u> at 260-61.

Although the injuries occurred in Alaska, which weighs in favor of Alaska law, the parties dispute where the "conduct causing the injury" occurred. Plaintiffs contend CMI's defectively designed products, the engine cylinders, were shipped to and installed in Preston's airplane in Washington. The evidence at trial indicated that the prior owner, a Washington resident, had all six cylinders replaced with CMI parts in 2005 in Washington. Plaintiffs argue introducing the defective cylinders into the stream of commerce in Washington was the conduct causing the crash.

On the other hand, CMI argues Preston's negligence occurred in Alaska. In Martin v. Goodyear Tire & Rubber Co., 114 Wn. App. 823, 61 P.3d 1196 (2003), however, this court held that in product liability cases, we look to the conduct alleged by the plaintiff and not the allegation of contributory negligence. The defendant in that case, Goodyear Tire & Rubber Company, argued the motorists' injuries and death were not caused by a defective commercial truck wheel but were, instead, caused by the truck owner, Humbert Construction, overloading the vehicle in Oregon. Id. at 830. The court stated, "Goodyear's arguments in favor of Oregon law rely heavily on acts and omissions committed by Humbert, but Humbert's acts and omissions are not relevant to this inquiry. Instead, we must focus on the contacts pertinent to the products liability claims against Goodyear." Id. (emphasis added). Thus, under Martin, the conduct causing Plaintiffs' injuries was the design of an allegedly defective cylinder. That conduct occurred in Alabama, not in Washington or Alaska. Therefore, this factor does not weigh in favor of either party.

As to residency, the Cavners are Alaska residents. The Zienteks are Texas residents. CMI is an Alabama corporation. None of the parties to the appeal reside or are domiciled in Washington. This factor seems to weigh against Washington.

The final factor is the place where the relationship of the parties "is centered." Plaintiffs argue the relationship between CMI and the Plaintiffs is centered in Washington because Preston purchased the plane in Washington, CMI's allegedly defective cylinders were installed here, and Preston had the engine's compression inspected here. The plane was flown for years in Washington before being sold in this state, but then Preston flew the plane for months in Alaska before the crash. We conclude these contacts seem to balance each other out.

In Johnson, the Supreme Court indicated that we are not to merely count contacts when assessing choice of law; we must instead consider which contacts are the most significant. 87 Wn.2d at 581. The most significant contacts appear to be the place where the injuries occurred (Alaska), the place where the allegedly defective product was installed in the plane (Washington), the place where the allegedly defective product was purchased (Washington), the place where it was used (Washington and Alaska), and the place where the majority of Plaintiffs reside (Alaska). Under these facts, both Alaska and Washington have a relationship to this lawsuit, and the contacts are evenly balanced.

Given this balance, we must evaluate which state has the greater interest in the products liability dispute in light of the public policies at issue. We find Johnson the most helpful here. In that case, a Kansas resident was killed when

scaffolding designed and manufactured in Washington collapsed. 87 Wn.2d at 578. Kansas law limited recovery to $50,000, while Washington allowed unlimited recovery in a wrongful death action. Id. at 582.

The Supreme Court recognized that a state's interest in limiting wrongful death damages is to protect defendants from excessive financial burdens and to eliminate speculative claims and difficult computation issues. Id. at 582-83. It concluded, however, that the interest was primarily local, meaning it was enacted to protect its own residents. Id. at 583. But applying a Kansas law capping damages would not protect any Kansas resident because the defendant was a Washington company. Id. at 583-84.

On the other hand, the Supreme Court noted that Washington has a strong deterrent policy of full compensation which would be advanced by the application of its own of law. Id. at 583. "Unlimited recovery will deter tortious conduct and will encourage respondents to make safe products for its customers." Id. And as this court recently recognized in Singh, the scaffolding company in Johnson sold its products in all 50 states, only a few of which had limitations on wrongful death recoveries, making it highly unlikely the manufacturer relied on the Kansas limitation. Singh, 151 Wn. App. at 144.

In this case, Alaska law would limit Plaintiffs' ability to recover full compensation for their injuries. Imposing Alaska's cap on damages would not protect any Alaskan resident because CMI is an Alabama corporation. Under Alaska law, Stacie's noneconomic damages would be capped at $1,079,750 and Hudson's would be capped at $1.7 million. The jury awarded Stacie and Hudson

$3 million and $2 million in noneconomic damages respectively. Applying Alaska law to this case would harm, not benefit, Alaskan residents.

Moreover, CMI is one of the two primary aircraft engine manufacturers in the world. It distributes engines not only in Washington and Alaska, but around the world. Like the manufacturer in <u>Johnson</u>, CMI cannot argue it justifiably relied on the damage cap under Alaska law when it chose to sell its engines in states with no caps on noneconomic damages.

Under these facts, Washington's interest in providing full compensation to tort victims and its interest in protecting persons from injuries from defective products outweighs any interest Alaska might have in protecting an out-of-state manufacturer whose product arrived in that state through the stream of commerce. We, therefore, affirm the trial court's ruling that Washington law applies.

C. <u>Evidentiary Issues</u>

Plaintiffs challenge several evidentiary rulings on appeal. First, they argue the jury's finding that Preston was negligent should be reversed because the trial court erred in limiting evidence the aircraft could fly safely in an overloaded condition and erred in admitting lay witness testimony that overloading the plane caused the crash. Second, they seek a new trial on their failure to warn claim, arguing the trial court abused its discretion in limiting the number of warranty claims they could present to the jury. Finally, Plaintiffs contend the cumulative effect of these alleged errors denied them a fair trial.

The standard of review for evidentiary rulings made by the trial court is abuse of discretion. <u>Peralta v. State</u>, 187 Wn.2d 888, 894, 389 P.3d 596 (2017).

This court will reverse a trial court's evidentiary rulings only when no reasonable person would take the view adopted by the trial court. Id.

### 1. FAA Ferry Permits and Pilot Testimony

Plaintiffs argue that the trial court erred in excluding evidence that the FAA allowed Cessna U206 aircraft to be flown over the certified gross takeoff weight. They contend they should have been allowed to present evidence the FAA issues "ferry permits," under which pilots may overload this aircraft between 115 and 130 percent of the takeoff weight limit.

CMI moved pretrial to exclude any evidence of FAA ferry permits under ER 401 and 403. CMI argued FAA ferry permits are only available for Cessnas built in the 1980s or later because those models were structurally stronger than the 1976 model Preston owned. The trial court granted the motion, reasoning that the evidence had limited probative value because Preston's plane did not qualify for such a permit, and the key issue was the capability of his plane to fly when overloaded and not whether the FAA had issued permits to other planes to fly in an overloaded state. The court deemed the prejudicial value of such evidence outweighed its probative value.

During trial, Plaintiffs sought reconsideration of this ruling, arguing that CMI had opened the door to ferry permits when CMI's expert, Douglas Marwill, testified "[i]n this particular case[,] the FAA has determined that in flight at a weight beyond 3600 pounds is not a safe area to be in." Plaintiffs submitted two declarations from expert Steve Meyers, challenging the factual assertion that Preston's plane could

not have qualified for a ferry permit. CMI, in turn, submitted a declaration from Marwill, contesting the factual basis for Meyers' opinions.

The trial court determined Marwill's testimony did not open the door to FAA ferry permit evidence. It concluded the criteria for granting a ferry permit was "really quite subjective . . . and I don't find that that is probative, that subjective determination for another airplane is probative of the capacity of the Cavner airplane to overcome the prejudicial nature of that testimony." The court ruled Plaintiffs could present evidence "regarding the capacity of the Cavner airplane, and if their expert is going to come in and say this airplane can fly above 3600 pounds gross weight for takeoff, they can."

On appeal, Plaintiffs contend their experts' testimony regarding the FAA ferry permits was "conditionally relevant" and admissible under ER 104(b) to show Preston's plane could have qualified for an FAA permit to fly as much as 130 percent overweight. They argue the trial court erroneously made the factual determination that Preston's plane could not qualify for this permit as a matter of law, instead of allowing the jury to make that determination.

We find no indication, however, that Plaintiffs ever raised ER 104(b) at the trial court level as a basis for admitting ferry permit evidence. "A party may only assign error in the appellate court on the specific ground of the evidentiary objection made at trial." State v. Guloy, 104 Wn.2d 412, 422, 705 P.2d 1182 (1985). By failing to raise an ER 104(b) objection at trial, Plaintiffs waived this objection.

The trial court balanced the probative value of the evidence that under certain circumstances, the FAA might have granted Preston a permit to fly this plane overweight, against the potential to mislead the jury into concluding the FAA would have granted such a permit to do so as the plane was configured on June 1, 2010. Because a trial court has considerable discretion in administering ER 403, reversible error is found only in the exceptional circumstances of a manifest abuse of discretion. Carson v. Fine, 123 Wn.2d 206, 226, 867 P.2d 610 (1994).

Plaintiffs did raise ER 611 as a basis for questioning Marwill about FAA ferry permits to impeach his opinion that the FAA determined flying a Cessna U206F in excess of 3,600 pounds was unsafe. But courts have the discretion to deny cross-examination if the evidence sought is speculative. Farah v. Hertz Transporting, Inc., 196 Wn. App. 171, 187, 383 P.3d 552 (2016), review denied sub nom., Farah v. Hertz Transp., Inc., 187 Wn.2d 1023, 390 P.3d 332 (2017). The trial court essentially determined it was speculative to assume Preston could have qualified his plane, as configured on the day of the accident, for an FAA ferry permit. Additionally, Plaintiffs were able to effectively cross-examine Marwill even without evidence of ferry permits. Plaintiffs elicited testimony from him that the Cessna U206F was able to fly over the weight limitation without crashing. Marwill conceded "the airplane could fly a few hundred pounds over gross weight." .

Moreover, Plaintiffs presented extensive evidence that the Cessna U206F aircraft is a "workhorse," able to haul substantial loads and still perform well, that Preston's plane was "more than capable" of climbing at that weight and configuration, and that the plane actually flew for up to one half mile before

crashing, despite being overloaded. Several experts testified that neither the overweight condition of Preston's plane nor the manner in which Preston loaded it caused the accident. Expert Donald Sommer testified the plane may not have been "airworthy" as defined by the FAA, but the plane remained safe to fly. Excluding evidence of FAA ferry permits did not preclude Plaintiffs from presenting this evidence or from effectively cross-examining CMI experts. Thus, Plaintiffs have not demonstrated any manifest abuse of discretion.

Plaintiffs also seek to reverse the finding of Preston's negligence based on the exclusion of testimony from experienced pilots, Gary Graham and Jerry Wells, who would have testified they regularly and safely fly Cessna U206 aircraft loaded in excess of 3,600 pounds.

CMI also moved pretrial to exclude this evidence under ER 401 and 403. It argued Graham's and Wells's testimony had limited probative value unless Plaintiffs could establish the planes the pilots had flown were configured in a substantially similar manner to Preston's plane. The court denied the motion, ruling the pilots could testify if Plaintiffs could lay a foundation to show some link between the pilots' opinions and the configuration of Preston's plane. The court stated, "It doesn't have to have every bell and whistle that the Cavner plane had on it, but it has to be a like scenario. In my mind that would include the significant feature of the belly pod."

The parties revisited this issue during trial when Plaintiffs discussed the scope of testimony from pilot Gary Graham. Plaintiffs stated Graham, an experienced Alaskan pilot, would testify he had flown Cessna U206F aircraft many

times in overweight conditions, including once with as much as 1,000 pounds over the FAA maximum. He had not flown the plane with a belly pod but had observed one being flown. Plaintiffs noted Graham would testify the presence of the belly pod did not make any difference from his observation and experience. The trial court explicitly ruled this testimony was permitted. Neither Graham nor Wells testified at trial.

A trial court has the discretion to determine whether an expert witness's experiences are substantially similar to those at issue at trial. Breimon v. Gen. Motors Corp., 8 Wn. App. 747, 755-56, 509 P.2d 398 (1973). Its decision will stand unless there has been an abuse of discretion prejudicial to the losing party. Id.

Plaintiffs have failed to demonstrate any abuse of discretion in the trial court's description of what was necessary to lay the proper foundation for the pilots' testimony. Nor have Plaintiffs demonstrated any prejudice. Plaintiffs introduced evidence from other pilots that the Cessna U206F aircraft, whether or not equipped with a belly pod, is a workhorse, capable of flying safely in an overloaded condition. In addition, Preston testified he was trained to load this plane 115 percent overweight and flew his own plane routinely in an overloaded state without incident. Kyle Walker, the mechanic who installed the belly pod and worked for Preston for a short period of time, flew Preston's plane in what he thought was an overloaded condition without incident.

Finally, Preston's expert, Steve Meyers, testified he conducted a test flight with a Cessna U206F plane, equipped with a belly pod and loaded with as much weight as Preston loaded onto his plane on the day of the accident. The test flight

was videotaped and shown to the jury during trial. Meyers testified the test flight demonstrated the plane could climb at a weight of 4,154 pounds, and he was able to stabilize the plane in equilibrium and make turns in a helix pattern safely and without incident. In their closing, Plaintiffs pointed out that even CMI's experts admitted the plane could be safely flown in excess of 3,600 pounds. Plaintiffs have not demonstrated an abuse of discretion or any prejudice from the trial court's rulings relating to the proffered pilot testimony.

2. Lay Witness Testimony under ER 701(c)

Plaintiffs next ask us to reverse the jury's finding of Preston's negligence because the trial court erred in admitting impermissible opinion testimony from 10 lay witnesses as to the cause of the crash.

ER 701 provides that if:

the witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness, (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue, and (c) not based on scientific, technical, or other specialized knowledge within the scope of rule 702.

When ruling on the admissibility of ER 701 opinion evidence, the court does not abuse its discretion if the ruling "is fairly debatable." State v. King, 135 Wn. App. 662, 672, 145 P.3d 1224 (2006), abrogated on other grounds, State v. Schaler, 169 Wn.2d 274, 236 P.3d 858 (2010). Even if a trial court errs in admitting lay opinion testimony under ER 701, the admission of such evidence is subject to the harmless error standard. Ashley v. Hall, 138 Wn.2d 151, 158-59, 978 P.2d 1055 (1999).

Plaintiffs moved to exclude any opinions from eyewitnesses, many of whom were experienced pilots or airplane mechanics. They argued CMI should be prohibited from eliciting "opinion" testimony—such as "the plane was struggling to take off"—from persons not properly identified in CMI's expert disclosures. CMI, however, maintained the eyewitnesses should not be disqualified from testifying about their impressions of the plane's takeoff simply because they had specialized knowledge about some aspects of aviation.

The trial court refused to issue a blanket ruling about the appropriate scope of eyewitness testimony because the parties planned to call most through video depositions. The court reserved ruling until it could review the witnesses' testimony. It provided a general guideline as to what it deemed appropriate testimony from the eyewitnesses:

> Generally speaking, eyewitnesses get to testify about what they heard, what they saw, . . . . [T]hey can testify about some of their impressions.
>
> We used the term "struggling," but if, you know, if I see someone driving up the hill and they're burning the clutch, I'd be able to say, "They were struggling getting up the hill," right? But if they're going to the next phase or the next tier which is, "Well, based on all my years of experience as a pilot and seeing the nose up and the tail down and hearing the engine, I concluded this plane was grossly overloaded and the pilot was at fault," you're not going there with your lay . . . witnesses or your eyewitnesses to the crash.

The trial court reviewed the parties' deposition designations and ruled on objections. Plaintiffs asked the court to reconsider its ruling on objections to the testimony of two witnesses, Carl Merculief and James Barbeau. The court denied the motion except it excluded Merculief's testimony that typically a "stall attitude" occurs when a plane is "too heavy" or "overloaded." CMI appears not to have

redacted this specific question and answer when it edited the video of Merculief's testimony, and it seems that the jury heard the testimony despite the trial court's ruling. But Plaintiffs did not object or move to strike the testimony. They argue on appeal that "[a]ny motion to strike that one statement would have been pointless, given the similar evidence allowed by the trial court, and would only have drawn attention to that other evidence."

In general, lay opinion testimony should be excluded where the opinion calls for that of an expert. Id. at 156. Lay witnesses, however, may testify about their first-hand observations. Unger v. Cauchon, 118 Wn. App. 165, 177, 73 P.3d 1005 (2003). At times, it can be difficult to describe an event without offering an opinion or impression of what the witness saw or heard. As the Ninth Circuit noted:

> We understand [ER] 701 to mean that "opinions of non-experts may be admitted where the facts could not otherwise be adequately presented or described to the jury in such a way as to enable the jury to form an opinion or reach an intelligent conclusion. If it is impossible or difficult to reproduce the data observed by the witnesses, or the facts are difficult of explanation, or complex, or are of a combination of circumstances and appearances which cannot be adequately described and presented with the force and clearness as they appeared to the witness, the witness may state his impressions and opinions based on what he observed. It is a means of conveying to the jury what the witness has seen or heard."

United States v. Yazzie, 976 F.2d 1252, 1255 (9th Cir. 1992) (alteration omitted) (quoting United States v. Skeet, 665 F.2d 983, 985 (9th Cir. 1982)).

Plaintiffs argue if an opinion is based on a witness's specialized knowledge, it is only admissible under ER 702 and is inadmissible under ER 701. The case law, however, is not as definitive as Plaintiffs suggest. The line between what is permissible lay opinion under ER 701 and what is opinion testimony ordinarily

expected only from a qualified expert under ER 702 is understandably difficult at times to draw. See Asplundh Mfg. Div. v. Benton Harbor Eng'g, 57 F.3d 1190, 1199-1200 (3d Cir. 1995). The requirement that lay opinion testimony be "helpful to a clear understanding of the witness's testimony," however, ensures that any such opinion must be reliable. Id. at 1201. "In other words, [ER] 701 requires that a lay opinion witness have a reasonable basis grounded either in experience or specialized knowledge for arriving at the opinion that he or she expresses." Id.

In addition, a lay witness's practical experience in a given area can provide a basis for his or her opinion testimony. McInnis & Co., Inc. v. W. Tractor & Equip. Co., 67 Wn.2d 965, 970, 410 P.2d 908 (1966) (owner of company with knowledge of composition, use, and operation of equipment permitted to express opinion as to equipment's value). Furthermore, ER 701 gives the trial court considerable discretion in deciding, on the basis of facts in each individual case, whether opinion testimony would be helpful to the jury. 5B Karl B. Tegland, WASHINGTON PRACTICE: EVIDENCE LAW & PRACTICE § 701.7 (6th ed. 2016).

In this case, the trial court reviewed the deposition transcripts of all the eyewitnesses and excluded any testimony that might have strayed into the area reserved for expert witnesses under ER 701(c). None of the eyewitnesses expressed any opinion as to the cause of the crash or any piloting errors. Most of the testimony to which Plaintiffs object was simply witness recollections and impressions of what they heard and saw on the day of the crash. Many of the eyewitnesses had significant aviation experience, which given the location of the crash, was not unexpected. While their impressions and observations benefitted

from their piloting experience, none of them entered the realm of expert testimony by opining as to the cause of the crash or piloting errors Preston may have committed. The opinions were all rationally based on the witnesses' perceptions and helpful to a clear understanding of the witnesses' testimony.

Plaintiffs' reliance on Prescott v. R&L Transfer, Inc., 111 F. Supp. 3d 650 (W.D. Pa. 2015), is misplaced. In that case, Prescott sustained injuries after the tractor-trailer he was driving left the roadway and crashed into an embankment. Id. at 653. Prescott alleged that an R&L employee, also driving a tractor-trailer, forced him off the road and caused the accident. Id. Prescott sought to exclude testimony from another R&L truck driver, Robert Thomas, who passed the scene of the accident—traveling at 65 miles per hour—over nine hours after the accident occurred. Id. at 658. At his deposition, Thomas testified that tire marks at the scene of the accident were consistent with a driver falling asleep at the wheel. Id.

The court excluded this opinion under Rule 701. Id. First, it concluded that Thomas did not have firsthand knowledge that the tire marks he saw originated from Prescott's vehicle. Id. It ruled that his observations were insufficient to provide the necessary basis for an opinion that Prescott fell asleep at the wheel. Id. The court also concluded that because Thomas did not witness the accident, his opinion as to whether the driver fell asleep at the wheel was not helpful to the jury. Id. at 658-59.

This case is not analogous to Prescott. All the lay witnesses saw the plane, either while taxiing, on takeoff, or in the air, on June 1, 2010. Each witness detailed his or her observations. The fact that those observations were informed by

experience as a pilot or mechanic, or both, does not by default make them inadmissible opinion testimony. Plaintiffs have not demonstrated an abuse of discretion in the court's analysis under ER 701.

Even if the trial court erred in admitting the challenged evidence, Plaintiffs have not established that the evidentiary rulings constitute reversible error. The trial court correctly excluded as improper opinion testimony the statement from Merculief that "[the plane] was in a stall attitude," and a stall "typically" occurs when a plane is "too heavy" or "overloaded." CMI inadvertently failed to redact this testimony during the editing process. But Plaintiffs made the strategic decision not to request an instruction from the trial court for the jury to disregard this testimony. Improper opinion testimony may be cured by instructing the jury to disregard the improper testimony. State v. Hager, 171 Wn.2d 151, 159, 248 P.3d 512 (2011). Plaintiffs' failure to request such a curative instruction precludes assigning appeal to the admission of Merculief's improper opinion testimony.

In addition, improperly admitted evidence is harmless if the error "is of minor significance compared to the overall evidence as a whole." State v. Everybodytalksabout, 145 Wn.2d 456, 469, 39 P.3d 294 (2002). Merculief's statement was of minor significance when compared to the overall evidence of Preston's negligence. We conclude the trial court did not abuse its discretion in admitting the lay witness testimony.

3. Exclusion of CMI Warranty Claims

Plaintiffs also seek a new trial on their failure to warn claim, arguing the trial court erred in limiting the number and type of warranty claims Plaintiffs could

present to the jury. At trial, Plaintiffs offered 60 warranty claims CMI had received over a period of 10 years to establish CMI was on notice of compression or lifter problems in its engines. The court ruled that warranty claims would be admissible if (1) the claim involved the IO-520F engine; (2) the engine had been installed in a Cessna U206 aircraft; (3) the warranty claim identified either a compression issue or a valve lifter issue; (4) CMI allowed repairs on the engine in response to the claim; and (5) the warranty claim predated the June 1, 2010 accident. Ultimately, the trial court admitted 22 of the 60 warranty claims Plaintiffs offered.

To prevail on their failure to warn claim under RCW 7.72.030(1)(c), Plaintiffs had to prove that CMI knew or should have learned about a danger connected with its product requiring the issuance of warnings or instructions concerning the danger. In products liability cases, evidence of other accidents or claims may be admissible to establish notice to the manufacturer of a particular danger. Davis v. Globe Mach. Mfg. Co., 102 Wn.2d 68, 77, 684 P.2d 692 (1984). Like other evidentiary rulings, the admissibility of prior claims to show notice is left to the discretion of the trial court. Id.

Plaintiffs contend the trial court erred in excluding warranty claims relating to the same engine, model IO-520, simply because that engine had been installed in a plane other than a Cessna U206. The alleged defect, they argue, was in the engine, not in the plane. But the evidence was admissible for the limited purpose of establishing CMI was on notice of the alleged defect. Plaintiffs do not explain how the 38 excluded warranty claims would have notified CMI of a danger when the 22 admitted warranty claims did not. The exclusion of cumulative evidence is

generally not reversible error. Havens v. C&D Plastics, Inc., 124 Wn.2d 158, 169-70, 876 P.2d 435 (1994). The exclusion of cumulative "notice" evidence is similarly not reversible error. Kimball v. Otis Elevator Co., 89 Wn. App. 169, 173, 947 P.2d 1275 (1997) (harmless error to exclude maintenance reports showing elevator misleveling problems, as it was cumulative of admitted evidence). Even if the trial court erred in limiting the admissible warranty claims to those relating to IO-520 engines installed in Cessna U206 airplanes, the trial court's decision was harmless error, and we affirm the jury's verdict on Plaintiffs' failure to warn claim.[5]

4. Cumulative Error

Plaintiffs contend the cumulative errors denied them a fair trial. In criminal cases, cumulative error may warrant the reversal of a conviction even where a trial court's individual errors were harmless. In re the Pers. Restraint of Cross, 180 Wn.2d 664, 690, 327 P.3d 660 (2014), abrogated on other grounds, State v. Gregory, 192 Wn.2d 1, 427 P.3d 621 (2018). The test to determine whether cumulative errors require reversal is whether the totality of the circumstances "substantially prejudiced the defendant and denied him a fair trial." Id.

It is not clear the cumulative error doctrine applies in a civil case. Plaintiffs rely on Storey v. Storey, 21 Wn. App. 370, 585 P.2d 183 (1978), to extend the doctrine to civil appeals. But Storey affirmed a decision to grant a new trial based on the trial court's findings that a defendant's repeated intentional, improper, non-responsive answers and volunteered remarks prejudiced the plaintiffs. Id. at 372.

---

[5] On remand, the trial court will determine whether any or which warranty claims should be admitted to prove the existence of a design defect.

Thus, it was the cumulative effect of the defendant's prejudicial conduct that warranted a new trial, not the cumulative effect of errors allegedly committed by the trial court.

Nevertheless, even were the doctrine to apply, Plaintiffs must still establish the existence of multiple errors. Plaintiffs raise the fact that defense counsel willfully violated a pretrial order by telling the jury in CMI's opening statement that the FAA revoked Preston's license as a result of the accident. Before trial began, the trial court denied Plaintiffs' motion to exclude reference to the status of Preston's pilot license, including the FAA's revocation of it, determining that the fact of the license revocation was admissible but the reason for that revocation was not. But in opening, CMI stated that the FAA had investigated the crash and revoked Preston's license as a result.

Plaintiffs sought the exclusion of all evidence of pilot error as a sanction for CMI's violation. The trial court denied Plaintiffs' motion to exclude pilot error evidence and denied any motion for a mistrial. It concluded that any prejudice could be cured by excluding all evidence of Preston's license revocation. Plaintiffs requested a general curative instruction, which the trial court gave.

After the jury rendered its verdict, Plaintiffs moved for a new trial based, in part, on the misconduct of CMI's counsel during opening statements. The trial court denied the motion:

> The Court has previously (in some instances, more than once) considered the other basis brought now by [P]laintiffs in their request for a new trial. Plaintiffs have failed to produce new evidence or advance a sufficient alternative basis for the Court to reconsider its prior rulings. With respect [to] any alleged cumulative effect

> produced by defendant CMI's misconduct (the Court is particularly focused here on . . . counsel's opening statement and the withholding of the check ball housing diagram) the Court must consider whether these incidents, combined with the others referenced in their motion, produce a trial that was fundamentally unfair.
>
> Each side was able to present, and vigorously prosecute, their respective theories of this case. The jury heard those theories, considered the admissible evidence, and rendered its verdict. The various rulings on misconduct (and the sanctions imposed) and the Court's evidentiary rulings subject of this motion did not prevent, in this Court's estimation, a fair hearing for [P]laintiffs.

(citation omitted).

"As a general rule, the trial courts have wide discretionary powers in conducting a trial and dealing with irregularities which arise." Aluminum Co. of Am. v. Aetna Cas. & Sur. Co., 140 Wn.2d 517, 538-39, 998 P.2d 856 (2000) (Alcoa) (quoting State v. Gilcrist, 91 Wn.2d 603, 612, 590 P.2d 809 (1979)). In Alcoa, the Supreme Court held a new trial may be granted based on the prejudicial misconduct of counsel only if the moving party establishes that the conduct complained of constitutes misconduct and the misconduct is prejudicial in the context of the entire record. Id. When a party challenges the effect on the jury of events occurring during trial, we accord considerable deference to the trial court. Taylor v. Cessna Aircraft Co., 39 Wn. App. 828, 831, 696 P.2d 28 (1985).

Plaintiffs do not argue the trial court's handling of CMI's misconduct constitutes an independent basis for a new trial. Instead, they contend the prejudice they incurred, when combined with the prejudice from other alleged errors, justifies a new trial. We disagree.

First, Plaintiffs have not established any trial errors occurred. Second, the trial court promptly addressed CMI's violation of the order in limine, excluded all evidence regarding Preston's license revocation, and granted a curative instruction. Finally, the trial court was in a much better position than this court to evaluate the impact of the statement made by CMI in opening and the jury's ability to disregard statements or arguments of counsel when not supported by evidence presented at trial.

Because we conclude that the trial court did not abuse its discretion on any of these evidentiary rulings and that cumulative error does not justify a new trial, we affirm the jury's finding that Preston was negligent on June 1, 2010.

D. Appropriateness of Sanctions for CMI's Nondisclosure of Technical Drawing

Next, Plaintiffs seek a new trial on their manufacturing defect claim, arguing the trial court abused its discretion in fashioning the appropriate remedy to address CMI's willful nondisclosure of a technical drawing.

Plaintiffs presented evidence that a metallurgist, Dr. Richard McSwain, examined Preston's engine after the crash and discovered the presence of burrs, or sharp metal deformities, on the inside of 11 out of 12 valve check ball housings. Dr. McSwain testified these burrs can dislodge, float in the oil, and jam themselves between the check ball and its seat, rendering the check valve inoperative. To establish the presence of the burrs deviated from CMI design specifications, Plaintiffs elicited testimony from Dr. McSwain that CMI's assembly drawing for both the intake and exhaust lifters bore a note saying "Remove all burrs." He opined the presence of burrs evidenced a manufacturing flaw.

On cross-examination, CMI sought to elicit testimony that the note on the technical drawing for the assembly did not apply to the valve lifter subassembly. Dr. McSwain disagreed with this contention.

Plaintiffs' expert Donald Sommer also testified that the presence of burrs demonstrated poor manufacturing technique. Sommer, a former engineer with Eaton Corporation, the company CMI used to manufacture the valve lifter subassembly, testified that when he worked for Eaton, its technical drawings always required burrs to be removed during the manufacturing process. He rejected CMI's contention that the note "Remove all burrs" on the CMI assembly drawing did not apply to Eaton's check ball housing.

During CMI's case-in-chief, approximately six weeks into trial, CMI produced Eaton's subcomponent drawing for the check ball housing on the valve lifters. Eaton's drawing contained the instruction to "Remove all burrs." John Barton, a CMI expert, testified he had received the drawing three or four weeks earlier. Counsel for CMI disclosed he too had received a copy of the drawing weeks earlier and had chosen not to disclose it.

Plaintiffs moved for sanctions, seeking a directed verdict on the issue of a manufacturing defect. The trial court found that before trial, Plaintiffs requested production of the subassembly drawing, but CMI did not possess or control it at that time. It also found Plaintiffs asked CMI to produce the drawing during trial, CMI obtained a copy of the drawing from Eaton, and counsel for CMI made the decision not to produce it. The trial court found, however, that the harm caused by this withholding did not justify the relief Plaintiffs sought. It concluded that a

directed verdict was not the least severe sanction to be imposed "under Jones or Burnet."[6] Instead, the court allowed Plaintiffs to cross-examine CMI witnesses regarding the timing of the production of the subassembly drawing to ensure the jury knew it was not Plaintiffs' fault for not discussing the drawing in their case-in-chief. The court determined the most appropriate relief was to allow Plaintiffs to recall their experts at CMI's expense.

Dr. McSwain and Sommer returned to explain when they first received the Eaton technical drawing, what the drawing meant to them, and what, if anything, they would have said had they seen the drawing at the time they originally testified. Dr. McSwain testified the check ball drawing clearly instructed the manufacturer to "remove all burrs." He explained that he had not seen this drawing before testifying earlier in the trial because CMI had not produced it. Sommer, like Dr. McSwain, testified that CMI produced the drawing after he had testified in Plaintiffs' case-in-chief, and the drawing supported the opinion he had previously provided—the instruction to "remove all burrs" applied to the check ball housing. He testified at length as to why John Barton, the CMI expert, was incorrect in interpreting the "remove all burrs" instruction as being inapplicable to certain portions of the check ball housing. In his opinion, the newly-produced drawing confirmed that burrs found on the engine's valve lifters did not comply with the drawing specifications.

In closing arguments, Plaintiffs used CMI's non-disclosure to their advantage:

---

[6] Jones v. City of Seattle, 179 Wn.2d 322, 314 P.3d 380 (2013); Burnet v. Spokane Ambulance, 131 Wn.2d 484, 933 P.2d 1036 (1997).

[CMI] did not call anybody from Eaton, the current—either currently or a past employee—and Eaton is their prime component supplier of these lifters—to back up what Mr. Barton tried to argue about what the drawings meant.

Actually, the only Eaton current or former employee that did testify was our expert, Donald Sommer, the engineer, who has worked with Eaton drawings while working at Eaton.

. . . Remember, they weren't even actually produced even for us until the middle of trial.

. . . .

And you know from yesterday's testimony that, once [CMI] actually provided the subcomponent drawings, which it had been holding onto and not disclosing, you found the same deburring language requirement in the subcomponent drawings as there was on the assembly drawings. This was a serious, serious manufacturing defect which . . . [CMI tried to hide] by not disclosing these subcomponent drawings.

Both Dr. McSwain and Don Sommer—again formerly of Eaton—could confirm that the subcomponent drawings conform to the assembly drawing in requiring removal of all burrs. And the burrs also were found to be of a size that were—even the highest tolerance amount of the burr on the subcomponent drawing were the one place they allow it, we found burrs in excess of that size in these lifters on the subject plane.

The trial court ordered CMI to compensate Plaintiffs for the cost of having to recall Dr. McSwain and Sommer and awarded attorney fees for the sanctions motion.

This court reviews a trial court's discovery sanctions for abuse of discretion. Magaña v. Hyundai Motor Am., 167 Wn.2d 570, 582, 220 P.3d 191 (2009). A trial court exercises broad discretion in imposing discovery sanctions, and its determination will not be disturbed absent a clear abuse of discretion. Id. A trial court abuses its discretion only when its order is manifestly unreasonable or based on untenable grounds. Id. A discretionary decision rests on "untenable grounds"

or is based on "untenable reasons" if the trial court relies on unsupported facts or applies the wrong legal standard. Id. at 583. The trial court's decision is manifestly unreasonable only if the trial court, despite applying the correct legal standard to the supported facts, adopts a view that no reasonable person would take. Id.

Plaintiffs do not contend the trial court relied on unsupported facts. Nor do they argue the trial court applied the wrong legal standard. The trial court applied Magaña, Jones, and Burnet in rendering its ruling. Instead, Plaintiffs contend the trial court "manifestly underestimated the nature and degree of the prejudice suffered." They argue the check ball housing drawing went to the heart of their case, and by withholding the drawing, CMI forced Plaintiffs' experts to spend unnecessary time during trial arguing about whether the "remove all burrs" notation on the assembly drawing applied to the subcomponent part. They claim CMI received the benefit of controlling when the jury first heard about the "dispositive document."

Although we do not condone counsel's conduct, we find no manifest abuse of discretion in fashioning the appropriate sanction. Plaintiffs argued below that they were prejudiced by the timing of the late disclosure, and their "entire case has revolved around the supposed nonexistence of any burring specifications on the subcomponent drawings for the check ball housing." The trial court, however, after having heard both parties explain the meaning of the "remove all burrs" notes on the drawings, concluded the drawing was not as definitive as Plaintiffs claimed it to be. The court specifically noted that "[t]he representations are that the document, by your experts, says, A; the representations by their experts is it says

B, and you know, as I look at it, I see both arguments are plausible." The trial court evaluated Plaintiffs' claimed prejudice and found it to be much less than they claimed.

Second, the trial court was in a much better position than this court to evaluate the significance of the drawing and its late disclosure by CMI. By the time the drawing surfaced, the trial court had been presiding over the trial for almost six weeks. It was the most familiar with the direct testimony of Plaintiffs' engineering experts, Sommers and Dr. McSwain. It was the most familiar with the questions CMI posed on cross-examination, challenging the experts' interpretation of the drawings. And it was most familiar with the centrality of the drawings to Plaintiffs' manufacturing defect claim.

Finally, the trial court recognized the trial was still in progress. Although Plaintiffs had completed their case-in-chief, they were permitted to recall their engineering experts to explain when they first saw the subcomponent drawing and how they interpreted the notes on it. There was a way to cure the prejudice without entering a directed verdict.

Plaintiffs rely on Smith v. Behr Process Corp., 113 Wn. App. 306, 54 P.3d 665 (2002), for the proposition that reversal of the jury's verdict is the only appropriate sanction. In Smith, plaintiffs brought a class action lawsuit alleging that Behr's products, intended for use on exterior wood surfaces, caused extensive mildew damage to their homes. Id. at 314-35. When plaintiffs deposed a representative of a company that provided the mildewcide to Behr, they learned that this supplier had performed tests at Behr's request to determine the chemical

compatibility between the mildewcide and the other ingredients in Behr's product. Id. at 315-16. Behr had withheld from production both the fact of the testing and the test results. Id. at 316. When the plaintiffs began to investigate, they found additional undisclosed documents. Id.

The trial court held a multi-day evidentiary hearing on the plaintiffs' motion for discovery sanctions. Id. It found that Behr had willfully and deliberately failed to disclose evidence, that the class and judicial system were substantially prejudiced by this failure, and that only a default judgment would adequately remedy the harm to the class and punish Behr. Id.

Behr appealed, arguing the plaintiff class had not established substantial prejudice resulting from the discovery violations. Id. at 323-24. This court rejected Behr's argument. In doing so, it relied on the trial court's finding that the withheld documents were highly important because they bolstered the plaintiffs' case and undermined Behr's position. Id. at 325. It noted the trial court's finding that "nothing in the discovery of this case is as important as what was not disclosed." Id. It concluded there was reasonable evidentiary support for the trial court's findings. Id. at 326-27.

Smith supports our conclusion that the trial court, and not this court, is in the best position to evaluate the prejudice caused by a discovery violation. And Smith also makes clear the most appropriate sanction will be fact-specific and case-specific. Unlike in Smith, the trial court here found the withheld drawing to be subject to two reasonable interpretations and not a "smoking gun" as Plaintiffs contend. The trial court appropriately assessed monetary sanctions to ensure

Plaintiffs did not incur unnecessary expenses to recall their engineering experts to testify about the drawing.

Based on this record, the trial court did not abuse its discretion in concluding any prejudice was cured by recalling experts to testify at CMI's expense. We affirm the jury's verdict on Plaintiffs' manufacturing defect claim.

### E. Cavner Plaintiffs' Contingent Cross-Claim against Preston

CMI contends in its cross-appeal that the trial court erred in allowing Stacie, Hudson, and Myles's estate to assert a contingent cross-claim against Preston. On August 15, 2014, Plaintiffs filed a Second Amended Complaint in which Stacie and the children asserted a cross-claim against Preston. They alleged:

> In the event the trier of fact determines that Preston Cavner is partially at fault for the crash pursuant to RCW 4.22.070, [Stacie, Hudson, and Myles's estate] assert direct claims against Preston Cavner, and request that judgment be entered for them against Preston Cavner . . . and CMI, jointly and severally, for injuries and damages pled herein to the extent of the combined percentages of fault of Preston Cavner . . . and CMI, as determined by the trier of fact pursuant to RCW 4.22.070.

The trial court denied defense motions to dismiss this cross-claim.

In January 2016, CMI filed a "Motion to Realign Preston Cavner as a Plaintiff." CMI argued Stacie and the children were attempting to "circumvent the Washington rule of several liability" and take advantage of the joint and several liability rule of RCW 4.22.070(b) for fault-free plaintiffs.[7] CMI argued the Cavner family members should not be allowed to shift liability for Preston's "misconduct"

---

[7] CMI did not contend that any of the children were at fault. It did seek to hold Stacie at fault for holding Myles in her lap and failing to use a seat belt. The jury found Stacie was not at fault for any of the damages.

and, thereby, profit from his "recklessness." The trial court reserved ruling on CMI's motion until the conclusion of trial.

At the close of Plaintiffs' case-in-chief, CMI moved for judgment as a matter of law on the cross-claim against Preston. It argued the Cavner family members failed to produce evidence supporting a claim that Preston caused their injuries. The trial court denied the motion, concluding the evidence presented by CMI through cross-examination was sufficient to establish that Preston overloaded the plane, that his center of gravity calculations were "done on the fly," and that he installed a belly pod without documenting the work properly with the FAA. The court recognized "the experts alone didn't say that [Preston was culpable], but they made an awful lot of concessions on cross-examination where a jury could take that information and decide that he did have responsibility."

CMI asserts the trial court erred in determining the Cavner family could assert a contingent cross-claim against Preston under RCW 4.22.070(b). This court reviews a trial court's denial of a CR 50 motion for judgment as a matter of law de novo, engaging in the same inquiry as the trial court. Schmidt v. Coogan, 162 Wn.2d 488, 491, 173 P.3d 273 (2007).

First, CMI contends neither the civil rules nor RCW 4.22.070(b) permits the filing of a contingent cross-claim between plaintiffs. Whether a plaintiff may assert a cross-claim against another plaintiff under the civil rules or RCW 4.22.070(b) presents us with a question of rule and statutory construction. Issues of statutory construction are subject to de novo review. State v. Evans, 177 Wn.2d 186, 191,

298 P.3d 724 (2013). We also review a trial court's interpretation of a civil rule de novo. Nevers v. Fireside, Inc., 133 Wn.2d 804, 809, 947 P.3d 721 (1997).

CMI argues that under CR 7(a), a "cross-claim" can only appear in an answer to a complaint. But there is no language in CR 7(a) to support this argument. CR 7(a) merely identifies the type of pleadings that courts allow to be filed. One of the allowed pleadings is "an answer to a cross-claim, if the answer contains a cross-claim." CR 7(a). It does not logically follow from this language that the only pleading in which a party may assert a cross-claim is in an answer to a complaint. Nothing in CR 7 precludes one plaintiff from pleading a cross-claim against another plaintiff in an amended complaint. In fact, CR 8(e)(2) expressly allows a party to state "as many separate claims or defenses as the party has regardless of consistency and whether based on legal or on equitable grounds or on both." The rule even states that claims may be "alternative" or "hypothetical."

CMI also contends the Cavner family members should be precluded from asserting a cross-claim against Preston because it should not be at risk to pay for Preston's negligence. RCW 4.22.070(b) provides:

> If the trier of fact determines that the claimant or party suffering bodily injury or incurring property damages was not at fault, the defendants against whom judgment is entered shall be jointly and severally liable for the sum of their proportionate shares of the claimants [claimant's] total damages.

Because Stacie was found to be fault free and CMI agreed neither of the children were at fault, a jury finding that both CMI and Preston are partially at fault would result in entry of judgment under which CMI would be liable to the Cavner family members for Preston's proportionate share of their damages. CMI argues such a

result would be absurd because Preston's interests are aligned with those of his wife and children. CMI relies on Kottler v. Washington, 136 Wn.2d 437, 963 P.2d 834 (1998), and Tegman v. Accident & Medical Investigations, Inc., 150 Wn.2d 102, 75 P.3d 497 (2003), to support its argument that it should not be held jointly liable with Preston for his family's injuries.

Neither Kottler nor Tegman address this question. In Kottler, the Supreme Court held a defendant who settles pretrial with a fault-free plaintiff may not seek contribution from another alleged tortfeasor. 136 Wn.2d at 439. It held joint and several liability does not arise under RCW 4.22.070(b) unless a judgment is entered against the defendant and the alleged tortfeasor. Id. Without joint and several liability, there is no right to contribution. Id. at 449. In ruling, the Supreme Court stated that "[t]o qualify for this exception [to several liability,] the original party must be fault-free and both parties to the contribution action must have been defendants against whom judgment was entered in the underlying action." Id. This sentence, however, does not mean CMI will have no right of contribution against Preston because Preston is a "cross-claim defendant."

Tegman is similarly inapplicable. In that case, the Supreme Court held negligent defendants are not jointly and severally liable for the intentional torts of a co-defendant. 150 Wn.2d at 105. No one alleges Preston's actions were intentional.

CMI next argues that Preston should have been "realigned" as a plaintiff. The federal cases on which CMI relies, however, are not on point. In City of Indianapolis v. Chase National Bank of City of New York, 314 U.S. 63, 62 S. Ct.

15, 86 L. Ed. 47 (1941), the United States Supreme Court stated that when determining the existence of diversity jurisdiction, a federal district court should not accept the parties' determination of who are plaintiffs and who are defendants, but should look beyond the pleadings to arrange parties according to their side in a dispute. Id. at 69. Similarly, in Continental Airlines, Inc. v. Goodyear Tire & Rubber Co., 819 F.2d 1519 (9th Cir. 1987), the Ninth Circuit held the federal courts lacked jurisdiction over a dispute because one of the named defendants was aligned with the plaintiff. Id. at 1522-23. This alignment destroyed complete diversity, requiring remand to state court. Id. at 1523. Both cases, however, addressed the very limited issue of how to analyze federal diversity jurisdiction when a plaintiff names a party as a defendant, even when they have aligned legal interests. Neither case is analytically helpful to CMI.

Finally, CMI contends its CR 50 motion should have been granted because the Cavner family members presented no evidence of pilot error and their experts actually exonerated Preston of liability. A CR 50(b) motion admits the truth of the opponent's evidence and all inferences that can reasonably be drawn from it. Queen City Farms, Inc. v. Cent. Nat'l Ins. Co. of Omaha, 126 Wn.2d 50, 98, 882 P.2d 703 (1994). Granting a motion for judgment as a matter of law is appropriate when, viewing the evidence in the light most favorable to the nonmoving party, the court can say, as a matter of law, there is no substantial evidence or reasonable inference to sustain a verdict for the nonmoving party. Sing v. John L. Scott, Inc., 134 Wn.2d 24, 29, 948 P.2d 816 (1997).

The Cavner family's cross-claim against Preston required evidence of duty, breach, proximate cause, and damage. Ranger Ins. Co. v. Pierce County, 164 Wn.2d 545, 552, 192 P.3d 886 (2008). When evaluating whether a claimant has met its burden of production on a CR 50 motion, the court considers all the evidence, regardless of which party introduced it. Whitchurch v. McBride, 63 Wn. App. 272, 275, 818 P.2d 622 (1991). It was undisputed below that Preston, as pilot in command of the Cessna on the day of the accident, owed a duty of care to his passengers. CMI, through its cross-examination of Plaintiffs' experts, elicited evidence that Preston overloaded the plane, failed to properly balance the load to ensure the cargo was within the manufacturer's specified center of gravity envelope, failed to properly document material modifications he made to the plane, and operated the plane in violation of FAA regulations, the pilot operating handbook, and the supplemental operating handbook issued by the manufacturer of the belly pod. There was more than ample evidence presented to the jury during Plaintiffs' case-in-chief from which it could find Preston breached his duty of care.

A plaintiff also bears the burden of producing evidence sufficient to support a finding of causation. Id. None of Plaintiffs' experts testified that Preston proximately caused the crash. But expert testimony is not always required to establish causation to survive a CR 50 motion. Estate of Bordon v. Dep't of Corr., 122 Wn. App. 227, 244, 95 P.3d 764 (2004). There must be some evidence linking a party's alleged negligence to the alleged harm to avoid speculation, but the nature of the negligence can provide this evidentiary link. Id.

The trial court denied CMI's CR 50 motion, concluding there was sufficient evidence from which a reasonable jury could find Preston was negligent and a proximate cause of the crash. The court pointed to Preston's pilot operating handbook as support for a finding of causation. It noted:

> [T]he evidence here supports a conclusion that the jury could find [Preston] negligent. He admitted the plane was overloaded. Numerous eyewitnesses have testified the plane was over weight limits. The plaintiffs' experts have conceded that, and the Pilots Operating Handbook, the quotations that I referenced just minutes ago to [CMI's counsel], are directly on point. If you overload this airplane, it can result in death or fatalities.
>
> And . . . I characterized or summarized the defense case earlier . . . , but its essence is that [Preston] overloaded this plane and that's what caused its demise in flight. I don't believe that you need an expert to wrap that up . . . for the jury.

The link between Preston's actions and the subsequent crash was not speculative. Preston was at the helm of the plane. He controlled the plane's maintenance, loading, balancing, takeoff, flight, and landing. Plaintiffs' experts admitted that flying a plane within weight and balance limits is critical to flight safety. They also conceded Preston flew this plane in violation of multiple FAA regulations and the pilot operating handbooks. At least one expert, Douglas Herlihy, testified he would not have used 30 degrees of flap angle on takeoff at the Anchorage airport. Plaintiffs' experts admitted that under FAA regulations, Preston's plane was not "airworthy" on the day of the accident and that a pilot should not fly a plane when unairworthy conditions occur. Based on this evidence, the jury could find Preston, as pilot in command, was directly responsible for and had final authority over the operation of the aircraft. The trial court did not err in

denying CMI's CR 50 motion to dismiss the Cavner family members' cross-claim against Preston.

## F. Scope of Remand

We affirm the jury's finding that Preston was negligent. We also affirm the findings not challenged on appeal—that Preston's negligence was a proximate cause of the crash, that Stacie was not negligent, and that neither Ace Aviation nor Northwest Seaplanes proximately caused the crash. We affirm the jury's verdict for CMI on the manufacturing defect and failure to warn claims. And finally, we affirm the jury's findings as to Plaintiffs' damages, as these findings were also not challenged on appeal.

The scope of remand will be limited to three questions—whether CMI's engine was not reasonably safe as designed under RCW 7.72.030(1)(a), whether any design defect was a proximate cause of the crash, and if so, how much fault to allocate between CMI and Preston Cavner.

REVERSED IN PART, AFFIRMED IN PART.

Andrus, J.

WE CONCUR:

Smith, J.

Hazelrigg, J.